LIBERTY MUTUAL INSURANCE COM-
PANY, Appellant,

v.

Oliver DAVIS and Lillie Mae Davis,
Appellees.

No. 25515.

United States Court of Appeals
Fifth Circuit.

April 7, 1969.

Rehearing Denied and Rehearing En
Banc Denied May 30, 1969.

Charles W. Pittman, Charlie Luckie, Jr., John R. Bush, MacFarlane, Ferguson, Allison & Kelly, Tampa, Fla., for appellant.

James W. Cullis, Daniel Scarritt, Icard, Merrill, Cullis, Timm & Holroyd, Sarasota, Fla., for appellees.

Before WISDOM, GODBOLD and SIMPSON, Circuit Judges.

WISDOM, Circuit Judge:

This diversity action is based on an insurance company's alleged bad faith in failing to settle certain personal injury claims within the limits of an insured's automobile liability insurance policy. The distinctive feature of the case is that there were multiple claims against an insolvent insured exceeding the limits of his policy. We affirm the judgment in favor of certain claimants, assignees of the insured.

Clinton Bess, the insured, an itinerant fruit-picker, was driving in Sarasota, Florida, November 25, 1962, when his automobile struck the rear end of a car occupied by Mr. and Mrs. Lewis Rawls. Bess' car careened head-on into a car oc-

cupied by the plaintiffs, Mr. and Mrs. Oliver Davis and their three children. The double collision resulted in serious injury to the five Davises and the two Rawlses. There has never been any question as to Bess' responsibility for the accident.

Liberty Mutual had issued an automobile liability policy to Bess with limits of $10,000 for personal injury to one person, $20,000 for personal injuries in one accident, and $5,000 for property damage.[1] It was soon evident to all concerned that the injury to two Davises alone would exceed $20,000, and that the Rawls claim also would exceed $20,000.[2] The insurer could expect no contribution from Bess; he was penniless.

The Davises' attorney, Robert Thompson, by telephone on March 27, 1963, to Richard A. Valeri, Tampa Claims Manager for Liberty Mutual, and by letter dated March 29, 1963, offered to compromise for $20,000. Liberty Mutual never questioned its responsibility to expend its policy limits on behalf of Bess and it recognized that six of the seven claimants had substantial injuries. The insurer refused the offer to compromise for fear that it would be liable to the Rawls, if it depleted the entire amount of the insurance proceeds by settling with the Davises. Thompson recalled his conversation with Valeri of March 27, 1963, as follows:

> He [Valeri] then said that they were —they meaning the company—were worried about having to make a payment over and above the 20; that they were afraid that if they paid my clients the policy limits, all that was available, that because of the Rawlses being involved in the accident also that they might have to pay to the Rawlses something over and above the 20. In other words, they only wanted to pay the 20.

An inter-office memorandum written by Valeri corroborates this explanation of

1. Suit is now pending to determine whether the collisions constituted a single accident under the policy. We express no opinion on the matter.

2. Mr. and Mrs. Rawls instituted suit against Bess on November 9, 1963, and obtained a verdict for $24,840 on May 6, 1965.

Liberty Mutual's reluctance to settle with the Davises:

> I can't see how we can make any definite commitments in view of the Rawls claims. Needless to say, we will promptly expend our efforts to line up both cases, obtain and confirm special. It would seem a very good likelihood that we will be willing to put our policy limits of 20,000 on the line for all claims of both vehicles as soon as we get them lined up.

On April 22, 1963, in response to a request by Valeri, G. I. Miller, house counsel for Liberty Mutual, reviewed the state of the law with regard to the settlement of multiple claims. He noted that "the primary duty is to our insured" and that this duty "is not diminished by reason of the fact * * * that our named insured lacks any financial responsibility". The memorandum continued:

> we are at liberty to compromise and settle any one or more of the asserted claims prior to reduction to judgment, even though our limits are exhausted in the process, without incurring liability to other claimants, and even though such other claimants later may become judgment creditors. New York follows the rule of "first in time, first in right", which rule applies as well to amicable settlements as to judgments. David v. Bauman [24 Misc.2d 67], 196 N.Y.S.2d 746 (1960). As a corrolary, we may not refuse a claimant's reasonable offer of settlement upon the theory that to pay such a reasonable settlement would exhaust our coverage limits, for to do so would leave us open to the familiar charge that we failed in bad faith to settle a claim within policy limits, having had an opportunity to effect such a settlement on a reasonable basis. I believe the same results would obtain should Florida law be applied. Auto Mutual Indemnity Co. v. Shaw [134 Fla. 815], 184 So. 852 (Fla.1938).

Miller was aware of Professor Keeton's suggestion [3] that in cases involving multiple claims the courts ought to recognize some form of allocation proceeding to determine percentages of available limits of coverage applicable to the several claims. Miller observed, however, that "no court has yet followed [Professor Keeton's] suggestion" and the company "would be under no duty to initiate such proceedings". The memorandum concludes:

> I do offer the practical suggestion that all potential claimants involved in the 10 P.M. episode, or their attorneys, be notified that the value of claims will doubtless exceed limits, and that these people be invited to participate jointly in efforts to reach agreement as to disposition of available funds. If agreement cannot be reached after expenditure of reasonable effort, then I can see no present reason why individual claims could not thereafter be disposed of individually on the basis of fair value, first come, first served.

Liberty Mutual ignored this advice from its home office counsel. Instead, it instructed Valeri to delay payment to the Davises pending the company's filing proceedings under the Federal Interpleader Act to bring both the Rawlses and the Davises into court. This suit was indeed filed.

May 8, 1963, the Davises sued Bess in the Circuit Court for Sarasota County. Thompson wrote Valeri that same day stating that "suit will be filed this date". He did not enclose a copy of the pleadings, and Bess, then in prison, failed to forward to the insurer any of the papers with which he was served. The Florida Circuit Court granted a preliminary default judgment on the issue of liability and set the case for final hearing on June 27, 1963. June 21, 1963, Liberty Mutual received notice from Thompson of the final hearing. June 25, 1963, Bess requested Liberty Mutual to defend the

---

3. Keeton, Preferential Settlement of Liability-Insurance Claims, 70 Harv.L.Rev. 27 (1956).

suit. June 26, 1963, an attorney whom the insurer had employed to defend Bess, filed a motion for a continuance and a motion to set aside the default. When the case was called for trial on damages the court summarily denied the defendant's motions. With scant ceremony, the insurer's attorney walked out, leaving Bess without representation on the issue of damages. The Court, sitting without a jury, awarded a judgment in favor of Mr. and Mrs. Davis for $48,500. The Florida Court of Appeals affirmed the judgment January 8, 1965, and, February 17, 1965, denied the petition for rehearing.

Again, Liberty Mutual had an opportunity to settle with the Davises. By letter dated March 9, 1965, Thompson offered to compromise the judgment for the policy limits if the demand should be met by March 19, 1965. The insurer took no action.

The Davises next petitioned for a writ of garnishment. Without opposition, the Florida court entered judgment against Liberty Mutual for $27,526.85. This amount included the full policy proceeds, interest, and expenses. Liberty Mutual paid the garnishment judgment May 5, 1965.

The following October, the plaintiffs' attorney approached Bess, who was still in prison, and obtained for the Davises an assignment of any claim that Bess might have against Liberty Mutual for the damage to Bess resulting from the company's refusal to settle the Davises' claim. In consideration of this assignment, the Davises released their claim to the unpaid portion of Bess' judgment debt.

The assignees then sued upon the refusal-to-settle claim. Libery Mutual removed the case to the District Court for the Middle District of Florida, under Title 28 U.S.C. § 1441. At the close of evidence, the district court denied the insurer's motion for a directed verdict on the issue of bad faith in the refusal to settle. The jury returned a vedict in favor of the Davises for $27,593 with interest at the rate of 6 per cent from May 5, 1965. The court added $10,000 for attorneys' fees.

## I.

The central issue in the case is whether the insurer was guilty of bad faith in refusing to settle with the Davises. The insurer concedes that there may be some question whether its concern about being a volunteer was legally justifiable, but insists that it was a good faith concern. The insurer contends that the trial court erred in not directing a verdict in its favor; erred in its charge to the jury on bad faith; erred in allowing evidence of negotiations before suit was filed; and erred in refusing to permit the insurer's experts to testify as to Liberty Mutual's good faith.

A. The first Florida decision involving the liability of an insurer for failure to settle within policy limits is Automobile Mutual Indemnity Co. v. Shaw, 1938, 134 Fla. 815, 184 So. 852. The Court held the insurer to "that degree of care and diligence which a man of ordinary care and prudence should exercise in the management of his own business". Yet at the same time the Court approved the "prevailing rule * * * that the insurer must act in good faith toward the assured in its effort to negotiate a settlement". This ambivalent langauge was construed in American Fidelity & Casualty Co. v. Greyhound Corporation, 5 Cir. 1956, 232 F.2d 89. This Court, in reversing and remanding, stated:

It thus appears quite clear that the Florida Supreme Court, in the Shaw case, aligned itself with the majority of jurisdictions adhering to the good faith test of the duty placed upon an insurer, rather than the negligence test. (Citation omitted)

* * * [Even though] evidence of negligence is admissible on the question of good faith, the test is * * * [still not] in effect converted from good faith to due care.

On the appeal after the remand, 258 F.2d 709, 716, the Court explained the "due care" language in Shaw:

> [F]rom the recitation of it by the Florida Court we reach the conclusion that it has adopted the rule that in the application of the good faith test consideration may be given to the negligence of the insurer in determining whether it has conducted settlement negotiations in good faith.

■ Later decisions of this Court and of the Florida courts make it clear that, "In Florida the Insurer is liable for the excess over policy limits for failure to exercise good faith in the defense, handling and settlement of a claim against the Assured.[4]" Burton v. State Farm Mutual Automobile Insurance Co., 5 Cir. 1964, 335 F.2d 317, 324 n. 14.

The complicating factor here is the existence of multiple claims.

The insurer concedes that the general rule is as stated in 70 ALR 2d 417:

> But where judgments were obtained or were about to be obtained against an insured in different actions, the courts, on a majority of the cases, have held that the proceeds were to be distributed on a first-come-first-served basis according to priority of judgment, although there is authority for prorata distribution regardless of when the judgments were obtained * * *
>
> Finally, it has been generally held that a liability insurer can settle with some claimants although to do so may exhaust the insurance fund or so deplete it that a subsequent judgment creditor is unable to collect his judgment in full from the remaining proceeds.

But, the insurer argues, no Florida court has clearly held that an insurer may exhaust its policy limits by preferential payments to some claimants but not to others. The real question, the insurer insists, is whether it had a duty to expend its policy limits to the exclusion of some claimants. The litigated cases usually involved some opportunity for the insurer to hold the insured harmless. In the case at bar Liberty Mutual never had an opportunity to hold Bess harmless; he would still have been exposed to the Rawlses' claims.

■ Undoubtedly these considerations determined Liberty Mutual's decision not to settle. Undoubtedly they are relevant to the ultimate jury question of bad faith. But they do not, as a matter of law, justify the trial court's directing a verdict for the insurer. It is still for the jury to decide whether the refusal to settle was primarily in its own interests and with too little regard for its insured's interests.

When several claimants are involved, and liability is evident, rejection of a single offer to compromise within policy limits does not necessarily conflict with the interest of the insured. He hopes to see the insurance fund used to compromise as much of his potential liability as possible. Of course, if the fund is needlessly exhausted on one claim, when it might cancel out others as well, the insured suffers from the company's readiness to settle.[5] To put the point another

---

4. Auto Mut. Indemnity Co. v. Shaw, 1938, 134 Fla. 815, 184 So. 852, 859; American Fire & Cas. Co. v. Davis, Fla.D.Ct. App., 1962, 146 So.2d 615, 617; American Fidelity & Casualty Co. v. Greyhound Corp., 5 Cir. 1956, 232 F.2d 89, 93; Dotschay v. National Mutual Ins. Co., 5 Cir. 1957, 246 F.2d 221, 222; Tully v. Travelers Ins. Co., N.D.Fla., 1954, 118 F.Supp. 568, 569; cf. Canal Ins. Co. v. Sturgis, Fla.D.Ct.App., 1959, 114 So.2d 469, 115 So.2d 774; Fla., 1960, 122 So. 2d 313; see 7A Appleman, Insurance § 4712 (1962). See also Hendry v. Grange Mutual Casualty Co., 5 Cir.

1967, 372 F.2d 222; Seward v. State Farm Mutual Automobile Insurance Company, 5 Cir. 1968, 392 F.2d 723.

5. In Brown v. United States Fidelity and Guaranty Company, 2 Cir. 1963, 314 F. 2d 675 the insurer reached an agreement with one claimant, but disabled itself from performing by lavishing excessive portions of the policy in the settlement of other, less meritorious, claims. The court accepted "the company's *overeager* settlement of the claims in disregard of the possibility of the assured's resulting personal liability" as evidence

way, even if liability be conceded, plaintiffs will usually settle for less than they would ultimately recover after trial, if only to save time and attorney's fees. Each settlement dollar will thus cancel out more than a dollar's worth of potential liability. Insured defendants will want their policy funds to blot out as large a share of the potential claim against them as possible. It follows that, insofar as the insureds' interest governs, the fund should not be exhausted without an attempt to settle as many claims as possible. But where the insurance proceeds are so slight compared with the totality of claims as to preclude any chance of comprehensive settlement, the insurer's insistence upon such a settlement profits the insured nothing. He would do better to have the leverage of his insurance money applied to at least some of the claims, to the end of reducing his ultimate judgment debt.

We conclude therefore that efforts to achieve a prorated, comprehensive settlement may excuse an insurer's reluctance to settle with less than all of the claimants, but need not do so. The question is for the jury to decide. As this Court put it in Springer v. Citizens Casualty Company, 5 Cir. 1957, 246 F.2d 123, 128–129, it is "a question for jury decision whether the insurer had not acted too much for its own protection and with too little regard for the rights of the insured in refusing to settle within the policy limits". Here, bearing in mind the existence of multiple claims and the insured's exposure to heavy damages, did the insurer act in good faith in managing the proceeds in a manner reasonably calculated to protect the insured by minimizing his total liability?[6] In many cases, efforts to achieve an overall agreement, even though entailing a refusal to settle immediately with one or more parties, will accord with the insurer's

duty. In other cases, use of the whole fund to cancel out a single claim will best serve to minimize the defendant's liability. Considerable leeway, of course, must be made for the insurer's honest business judgment, short of mismanagement tantamount to bad faith.

In the present case we are met with one conflict of interest between the Rawlses and the Davises, another (this litigation) between the Davises and Liberty Mutual, and a third between Liberty Mutual and Bess. It should be borne in mind that liability for refusal to settle only involves the last of those three conflicts. The Davises, as assignees, momentarily stand in Bess' shoes and seek to recoup his loss from the company's refusal to settle with a stranger to the insurance contract (the Davises themselves). It is possible injury to Bess, not to the Davises, that matters here. Correspondingly, whatever solicitude the company may have shown for the Rawls' cause and for an equitable division of the insurance proceeds, praiseworthy though it be, has no direct bearing on the real issue, which is the company's treatment of its insured.

This Court has recently clarified the test to be used in determining whether there is sufficient evidence to submit a case to the jury in connection with a motion for a directed verdict. Boeing Company v. Shipman, 5 Cir. 1969, 411 F.2d 365. Judge Ainsworth, for the Court en banc, reformulated the test as follows:

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider *all* of the evidence—not just that evidence which supports the non-mover's case— but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and over-

---

of the sort of bad faith upon which recovery might be premised. 314 F.2d at 682.

6. This principle operates with particular force where the defendant has no assets

other than the policy proceeds. Litigation over money in excess of the policy then would be a waste of the plaintiff's money, and he is all the more eager to compromise.

whelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

There was substantial evidence from which a jury could infer that the insurer was guilty of bad faith in giving more weight to its own interests than to the interests of the insured. In addition, the jury could reasonably have found that the insurer failed to exercise proper diligence to determine the facts as to damages[7]; failed to defend on the issue of damages; failed to explore the possibility of settling with all of the claimants; failed to settle with the Davises, when the insurer had conceded the insured's liability and knew that his exposure to damages would far exceed the policy limits; failed to act in accord with the prevailing law or even to heed the legal advice given by the insurer's home-office counsel that the company would be in no danger if it settled with the Davises and that these failures amounted to negligence tantamount to bad faith. In short, the district court did not err in denying the insurer's motion for a directed verdict.

B. The insurer contends that the district court erred in not defining "bad faith" as defined in the requested charge.[8] The Court, however, went into considerable detail in explaining good faith and bad faith and did so in accordance with the prevailing law. The Court charged, in part, as follows:

You are further charged that so long as an insurance company acts honestly and in good faith, it is not required to accept any offers of settlement, even though reasonable. The insurance company was under no contractual obligation to settle the claim of the Davises, and the mere fact that the claim was not settled does not make the insurance company liable in this case. The insurance company had the right to exercise its own judgment in the matter of settling the Davis claim, provided that it acted in good faith toward the insured, Bess.

7. Thompson testified that no one from the insurance company had come in to obtain the file and the medical reports he had made available to Liberty Mutual.

8. Defendants requested the following definition:
Bad faith, which will render an insurance company liable under a policy such as the one involved in this case for a Judgment in excess of the policy limits because of the company's failure to settle a claim within the policy limits, is not simply bad judgment or negligence, but it imports a dishonest purpose or some moral obliquity and implies conscious doing of wrong; it means a breach of known duty through some motive of interest or ill will, and connotes an actual intent to mislead or deceive another.
This Court, in American Fidelity & Casualty Co. v. Greyhound Corp., 5 Cir. 1958, 258 F.2d 709, disapproved the following instruction: " 'Bad faith' is defined as the actual intent to mislead or deceive another, and refers to a real and actual state of mind capable of either direct or circumstantial proof. Bad faith cannot be imputed unless there was something in the particular transaction equivalent, to fraud, actual or constructive."

A mistake in judgment is not bad faith. The insurance company is liable only if in bad faith it failed to avail itself of settlement opportunities within the policy limits, in bad faith.

As to bad faith, I charge you that the relationship between the insuror and the insured is such that the insuror must give a consideration to the interest of the insured equal to that consideration given its own interest in the matter, and it must act with good faith in all transactions involving the insured's interest.

There is a duty upon the insurance company, when acting upon a claimant's settlement offer within the policy limits, to make whatever decision concerning rejection or acceptance that honest judgment and discretion dictate in the light of all available facts and giving equal consideration to the insured's interest as well as its own.

Furthermore, on the question of good faith in rejecting an offer of settlement within the policy limits, only a decision made by an insuror who exercises diligence in apprising himself of the material facts is entitled to consideration as having been made in good faith.

Therefore, you may consider on this question of good or bad faith whether the investigation made by the insurance company was thorough enough to permit it to come to some fair, honest, and intelligent decision regarding the settlement opportunities in the light of the then existing probabilities.

The charge on negligence as an element of bad faith is based on this Court's interpretation of *Shaw* in American Fidelity & Casualty v. Greyhound:

You are instructed that the insurance company in this case is not liable merely because of any negligence in the handling of the Davis claim or lawsuit, or in the handling of any settlement negotiations with reference thereto, or in failing—any negligence in the handling of the Davis claim, or in the handling of any settlement negotiations with reference thereto, or in failing to effect a settlement with the Davises. However, evidence of such negligence, if any, may be considered by you on the question of whether the insurance company acted in bad faith.

The charge as to the insurer's duty when there are multiple claimants is similar to the legal advice Mr. G. I. Miller gave Liberty Mutual in his inter-office memorandum:

Now, where there is an accident which results in injuries to multiple claimants, you are instructed that any insurance company may settle the claims of less than all of those injured on a first come, first served basis, even though such settlement exhausts the policy limits, as long as the settlement is a fair and reasonable one.

Now, this does not mean that good faith on the part of the company requires such procedure, nor is failure to do so, of itself, proof of bad faith.

We regard the charge as a clear and fair statement of the law which a jury would understand.

■ C. The district judge acted within his judicial discretion in limiting the testimony of the insurer's experts. He did not allow them to testify on whether Liberty Mutual acted in bad faith. But he did allow them to testify that in their opinion "it was not unreasonable" for the insurer to refuse to settle with the Davises. This was as far as they were competent to go.

■ D. The district judge properly allowed evidence of negotiations before suit was filed. An insurer is not required to rush to settlement. Indeed, in Brown v. United States Fidelity & Guaranty Co., *supra,* fn. 5, the court held that an insurer's "over eager" settlement was evidence of bad faith. But each case must be determined upon its own facts. The insurer's investigation of the facts relating to liability and to damages, the extent and seriousness of the negotiations, and the insurer's rejection of settlement are all relevant to the issue of

good faith before as well as after suit is filed.

## II.

 Liberty Mutual attacks the assignment of Bess' claim to the Davises on the ground that a refusal-to-settle suit sounds in tort, since it is based on bad faith, and that Florida follows the common law rule that a personal injury claim is non-assignable. Clar v. Dade County, 3d D.C.A.Fla.1959, 116 So.2d 34; State Road Department v. Bender, 1941, 147 Fla. 15, 2 So.2d 298.[9] However, since assignability generally is the rule, and non-assignability is the exception, it would seem reasonable to confine the exception to wrongs due to the person, the reputation, or the feelings of the injured person. An insurer's failure to settle more closely resembles a wrong against property (the insured's pocketbook) than a tort of a purely personal nature. See Brown v. Guarantee Insurance Co., 1957, 155 Cal.App.2d 679, 319 P.2d 69, 66 A.L.R.2d 1202. Choses in action arising out of contract are, of course, assignable. Spears v. West Coast Builders Supply Co., 1931, 101 Fla. 980, 133 So. 97.

A claim against an insurer for refusal to settle cannot be fitted neatly into either tort or contract categories.

 The Florida Supreme Court, in Shaw, pointed out that, "This relationship [between the insurer and the insured] imposes upon the insurer the duty [to settle] not under the terms of the contract strictly speaking, but because of and flowing from it, to act honestly and in good faith toward the insured". 184 So. at 859. Cf. American Mutual Liability Insurance Co. of Boston, Mass.

v. Cooper, 5 Cir. 1932, 61 F.2d 446, 448. In American Fire & Casualty Co. v. Davis, 1st D.C.A.Fla.1962, 146 So.2d 615, 620, the court said:

The theory of this action is the conduct of the insurance company *arising out of the contract*—a breach of duty that would not have been owed by the insurer to the insured had the contract of insurance not been in existence. (Emphasis added)

These observations seem to say that in Florida the duty to settle in good faith arises out of the contractual relationship of insured and insurer as a result of the insurer's exclusive control of all questions of liability, settlement, of defense and management before and after the trial.

Courts in other states have approved the assignment of a cause of action for an insured's refusal to settle.[10] In Comunale v. Traders and General Insurance Company, 1958, 50 Cal.2d 654, 328 P.2d 198, 68 A.L.R.2d 883, a leading case, the California Supreme Court held that the claim is assignable whether the action is considered as sounding in tort or in contract. See also Critz v. Farmers Insurance Group, 1964, 230 Cal.App.2d 788, 41 Cal.Rptr. 401, 12 A.L.R.3d 1142; Gray v. Nationwide Mutual Insurance Co., 1966, 422 Pa. 500, 223 A.2d 8; Gedeon v. State Farm Mutual Auto Insurance Company, W.D.Pa.1966, 261 F. Supp. 122; Atlantic City v. American Casualty Insurance Company, D.C.N.J. 1966, 254 F.Supp. 396. But see Carne v. Maryland Casualty Co., 1961, 208 Tenn. 403, 346 S.W.2d 259; Dillingham v. Tri-State Insurance Co., 1964, 214 Tenn. 592, 381 S.W.2d 914.[11]

 If survival of an action, the traditional test of assignability, is ac-

---

9. *Clar* points out only that cases arising out of Florida's Wrongful Death Statute, F.S. §§ 768.01–768.03, F.S.A., are not assignable. That is because the statute provides specifically which classes of persons are entitled to sue for wrongful death.

 *Bender* referred to "pure" tort. In that case the court expressly excepted a

cause of action growing out of injury to property.

10. The cases are collected in an annotation appearing in 12 A.L.R.3d 1158.

11. The two Tennessee cases cited, *Carne* and *Dillingham* held that a cause of action for bad faith is not assignable because it does not survive the death of the plaintiff.

cepted it should be noted that Florida statutes permit the survival of claims for or against a decedent. F.S. § 45.11 (1959). See Note, Does the Liability Insurer have a Duty to Compromise, 14 Fla.L.Rev. 48, 53 (1961). There are strong policy considerations in favor of approving assignment of failure-to-settle claims to the injured claimant. A holding to the contrary would leave many judgment creditors without recourse. The claimant awarded damages may be left with a judgment-proof debtor whose only valuable asset is his cause of action against his insurer. It is unlikely that such an insured would undertake a complex and expensive suit against the insurer offering him no direct benefits. This would leave the injured party without recourse for his damages and would allow insurance companies to play fast and loose with claims against their less affluent policyholders. Here, assignability would benefit the assignor as well as the assignee to the extent that it diminished the wage garnishment to which he would be subjected. The policy reason against permitting an assignment of the claim is that it might encourage fraud and collusion between the insured and the injured claimant. This reasoning is inapplicable if, as in this case, the insurer has already rejected the settlement. In the circumstances this case presents, we agree with the district court's approval of the assignment.

## III.

Liberty next maintains that Thompson accomplished the assignment by resort to maintenance [12] and champerty.[13] An assignment of a chose in action is a distant and reputable cousin of maintenance and champerty:

The doctrines of champerty and maintenance as known to the common law, arise at an early date in England from causes peculiar to the state of society then existing. Out of the conditions then existing arose the common law rule which prohibited assignments of choses in action and the sale and transfer of land held adversely. The progress of law, enlightenment, and civilization during the past few hundred years has, however, to a large extent obviated the necessity of the stringent rules. In none of the states are the doctrines of champerty and maintenance preserved in their original vigor * * * Considering the status of society and conditions now prevailing in this country to transfer a right of action or to maintain the suit of another without having any direct or contingent interest in it will by no means necessarily produce mischief or oppression. Indeed, it may be that such assistance or maintenance will have a tendency to secure rights and promote the ends of justice. 14 Am. Jur.2d, Champerty and Maintenance, Sec. 1.

Thompson certainly initiated the transaction. He did so not gratuitously, however, but for the purpose of applying Bess' sole asset toward the Davises' unsatisfied judgment. The outstanding claim owing to his clients distinguishes Thompson from the voluntary intermeddlers involved in the cases (most of them

12. *Definition of Maintenance:* "At common law, maintenance signified an unlawful taking in hand or upholding of quarrels or sides to the disturbance or hindrance of common right * * * Maintenance existed where a person assisted another with money to carry on his cause, saved party to any expense to which he might otherwise be put, or otherwise bore him out in the whole or a part of the expense of the suit." 14 Am.Jur.2d, Champerty and Maintenance, Sec. 2, page 843.

13. *Definition of Champerty:* "Champerty is a species of maintenance. It is defined as a bargain by a champetor with a plaintiff or defendant for a portion of the matter involved in a suit in case of a successful termination of the action, which the champetor undertakes to maintain or carry on at his own expense." 14 Am.Jur.2d, Champerty and Maintenance, Sec. 3, pages 843–844.

somewhat mellow) cited by Liberty Mutual.

## IV.

Liberty Mutual further excepts to the District Court's award of attorney fees to the plaintiffs. It notes that the Florida statute in point awards such fees only to "an insured or the named beneficiary," in suits against an insurer. The Davises here stood in the shoes of the insured; they bought his claim. The purpose of the statute is to penalize an insurer's intransigence when it forces a claim to be litigated. Bad faith, if found, is the equivalent of such intransigence, and the penalty should be enforceable, by assignees no less than the insured. The entire cause of action was assigned, including Bess' right to attorneys' fees.

## V.

The final question we consider on appeal is whether interest should run from the date of garnishment payment or only from judgment. Liberty Mutual cites Florida authority to the effect that interest in tort actions accrues only from the time of judgment, which, in this case, would be the later date. Again, however, the tort-contract dichotomy cannot easily or rationally be extended to actions for refusal to settle. We note that in the *Shaw* case, *supra*, the court awarded interest from the date of the original judgment against the insured. On rehearing, the Florida Supreme Court upheld that element of the award. 134 Fla. 832, 184 So. 860.

The judgment is affirmed.

SIMPSON, Circuit Judge (dissenting):

I respectfully dissent. I view as unwarranted and unsound the conclusion of the majority that this cause of action is assignable under Florida law. Accordingly, I would reverse with directions to enter judgment for the insurer, Liberty Mutual.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

SIMPSON, Circuit Judge (dissenting).

I respectfully dissent.