1276

Said WIGGINS, Plaintiff,

v.

ALLSTATE PROPERTY AND
CASUALTY INSURANCE
COMPANY, Defendant.

Case No. 13–CV–23354.

United States District Court,
S.D. Florida.

Signed Feb. 27, 2015.

Filed March 2, 2015.

Mallory Leigh Gold, Ver Ploeg & Lumpkin, Stephen A. Marino, Jr., Ver Ploeg & Lumpkin, P.A., Philip Dixon Parrish, Philip D. Parrish PA, Miami, FL, Donna Brown Michelson, Miami, FL, for Plaintiff.

Laurie Jeanne Adams, Kubicki Draper, P.A., Melonie Bueno, Kubicki Draper, West Palm Beach, FL, for Defendant.

***ORDER***

KATHLEEN M. WILLIAMS, District Judge.

THIS MATTER is before the Court on Defendant Allstate's Motion for Summary Judgment [D.E. 70] and Plaintiff Said Wiggins' Motion for Summary Judgment [D.E. 66]. For the reasons stated below, Defendant's Motion is DENIED and Plaintiff's Motion is DENIED.

## I. Background

This bad faith action arises from an automobile accident involving Plaintiff Said Wiggins on June 1, 2008. At the time of the accident, Wiggins was driving an automobile owned by his girlfriend's mother, Phyllis Albury, an insured under Allstate policy number 94171159109/20 [D.E. 71 ¶ 1]. Wiggins was insured under the Allstate policy as a permissive driver [D.E. 67 ¶ 1; D.E. 71 ¶ 4]. The insurance policy on the vehicle contained uninsured motorist coverage with limits of $10,000.00 per person and $20,000.00 per accident [D.E. 15–1 at 7]. According to Wiggins, the driver that struck him, Jose Sierra, was an underinsured motorist [D.E. 67 ¶ 3].

After the accident, Wiggins was examined at South Miami Hospital, where he complained of injuries to his neck, lower back and right knee [D.E. 67–4 at 2–4]. Wiggins reported a "popping sensation" when he extended his right knee, and a physician noted "mild tenderness" of the knee. *Id.* at 3–6. Wiggins alerted Allstate about the collision on June 1, 2008, and he informed the insurer of his complaint about right knee pain on June 4, 2008 [D.E. 67–3 at 3].

Wiggins subsequently visited multiple times with Dr. Joel Shapiro, to whom he repeated his complaints about pain in his right knee [D.E. 67–5]. On November 3, 2008, Dr. Shapiro noted a "probable medial meniscus tear," and recommended an MRI exam. *Id.* at 5. Shapiro's office called Allstate on that date to inform the insurer that Wiggins will need an MRI [D.E. 67–3 at 19]. The MRI was performed on November 13, 2008, by Dr. Grazie Christie, who concluded that Wiggins suffered from

a medial meniscus tear in his right knee [D.E. 67–6].

Wiggins again visited Dr. Shapiro complaining of knee pain on February 23, 2009 [D.E. 67–8]. Dr. Shapiro then recommended an arthroscopy procedure. *Id.* By that time, however, Wiggins had exhausted his PIP limits under the Allstate policy [D.E. 67–3 at 21].

On March 6, 2009, Wiggins' attorney, Donna B. Michelson, sent a letter on his behalf to Allstate "with regard to Mr. Wiggins' underinsured motorist claim" [D.E. 71–6 at 1]. Enclosed with the letter was a copy of a demand letter Michelson had sent to State Farm, the insurance carrier for Jose Sierra, seeking the $15,000 limits of that policy. *Id.* at 2–3. Also enclosed were medical records Michelson sent to State Farm, including records of Wiggins' visits with Dr. Shapiro, and Dr. Christie's evaluation of the MRI and diagnosis of medial meniscal tear in Wiggins' right knee. *Id.* at 56–63. The medical bills at the time totaled $14,455, $10,000 of which was covered by Allstate's PIP coverage. *Id.* at 79.

Though Michelson's March 6, 2009, letter to Allstate did not explicitly demand the $10,000 of available underinsured motorist coverage, Allstate treated this letter as a demand for same [D.E. 71 ¶ 12; D.E. 71–3 at 4–5]. Following receipt of the letter, Wiggins' claim was taken up by Allstate adjuster Marizena Falcon [D.E. 71–3 at 5]. Falcon then completed a "Casualty Worksheet" based on her evaluation of the medical records provided by Michelson [D.E. 71–8]. The worksheet noted that Wiggins' "primary treating physician did not award a permanency." *Id.* The data from the Casualty Worksheet was then entered into Colossus, Allstate's claims adjustment software program [D.E. 68–3 at 10]. In addition, the medical records were

examined by an Allstate evaluation consultant, Michael Porter. *Id.* at 11.

On March 24, 2009, Colossus produced an evaluation of Wiggins' claim which stated: "The right knee injury was under care for 3 to 6 months with a prognosis of complaint, no more treatment" [D.E. 71–9]. The Colossus evaluation makes no mention of Dr. Christie's diagnosis of a meniscal tear, or of Dr. Shapiro's recommendation of arthroscopic surgery. Colossus recommended a gross settlement range of Wiggins' claim of $6,215 to $6,655. *Id.*

On that same date, Porter produced a separate evaluation in which he noted that Wiggins had an MRI indicating a right knee tear, but added that neither Dr. Shapiro nor Dr. Christie indicated a "permanency" of injury [D.E. 71–10]. He recommended an evaluation of the MRI and a record indicating a permanency after State Farm tendered its policy limit. *Id.*

Consistent with Porter's evaluation, Falcon sent a letter to Michelson informing her that Allstate had concluded that the value of Wiggins' claim fell within the limits of Sierra's State Farm policy [D.E. 71–11]. In the event that State Farm tendered its policy limit, Michelson was advised to provide Allstate with (1) copies of the settlement documents, (2) knee MRI films, and (3) "final discharge summary from the treating physician indicating the current condition, prognosis and permanency resulting from the accident." *Id.* On March 27, 2009, Michelson informed Allstate that State Farm had tendered the policy limits on the claim and sought permission to settle with State Farm, which Allstate granted [D.E. 71–12; D.E. 71–13].

On April 2, 2009, Wiggins was evaluated by an orthopedic surgeon, Dr. Arturo Corces, who identified an "internal derangement of the knee" and a medial men-

iscal tear and recommended arthroscopic surgery [D.E. 71–14 at 4–6].

On April 16, 2009, Wiggins' counsel notified Allstate of the settlement with State Farm and explicitly demanded Allstate's underinsured policy limit of $10,000. *Id.* at 1–2. At that time, Allstate also received a copy of the MRI on Wiggins' knee, and a report from Dr. Corces. *Id.* The letter highlighted Wiggins' torn meniscus and the recommendation for surgery, and informed Allstate that Wiggins could not pursue the surgery at that time because he did not have health insurance and his PIP insurance had been exhausted. *Id.*

Less than three weeks later, on May 5, 2009, Wiggins filed a Civil Remedy Notice of Violation with the Florida Department of Financial Services, as required by Fla. Stat. § 624.155(3)(a), in which he alleged that Allstate failed to attempt to settle his claim in good faith [D.E. 71–15 at 2–4]. Wiggins' counsel forwarded the Notice to Allstate and informed the insurer that it had 60 days from the date of receipt to correct the alleged violation. *Id.* at 1.

Allstate then had the MRI film independently reviewed by a radiologist, Dr. Paul Koenigsberg, who found "no definitive evidence for a meniscal tear" [D.E. 71–17]. In his report, Koenigsberg described the MRI as "somewhat limited given the low strength of field of the magnet." *Id.* Though Koenigsberg's report is dated May 14, 2009, it was not received by Falcon, the Allstate claims adjuster, until June 4, 2009 [D.E. 71–3 at 6].[1]

On June 12, 2009, Falcon informed Michelson, Wiggins' counsel, that Allstate's review found no evidence of a meniscal tear; in addition, Falcon discounted the report of Dr. Corces because "it did not appear that Dr. Corces had the benefit of the MRI films for his review and recommendation" [D.E. 71–18]. Falcon also noted that "Wiggins has not had the surgery and his doctor has not given his [sic] a permanency from this accident." *Id.* Finally, Falcon requested that any additional medical records be forwarded to her. *Id.*

In her deposition, Michelson testified that, in response to Falcon's letter, she hired yet another physician, Dr. Ronald Landau, to evaluate the MRI films [D.E. 68–2 at 10]. According to Michelson, Landau confirmed that the MRI showed a meniscal tear.[2] *Id.* at 12. On June 24, 2009, Michelson drafted a letter to Falcon informing her that a second radiologist had confirmed the meniscal tear and again accusing Allstate of acting in bad faith [D.E. 67–25]. Allstate never responded to this letter. Allstate's claim records make no reference to the June 24 letter, and Allstate asserts that there is no evidence that it received this letter [D.E. 76 at 14]. Wiggins has submitted a Transmission Verification Report that he says shows the letter was sent to Allstate via fax on June 24, 2009 [D.E. 67–26].

On July 17, 2009, Wiggins filed suit against Allstate in Miami–Dade Circuit Court for Allstate's alleged failure to provide underinsured motorist coverage under the policy [D.E. 71–19]. During the litigation, Allstate had Wiggins' MRI films evaluated by another physician, Dr. Stephen Brown, who concluded that the MRI did show a tear in the medial meniscus of Wiggins' right knee [D.E. 71–21 at 3]. Subsequently, Allstate offered the $10,000 policy limits in a Proposal of Settlement [D.E. 71–26]. Wiggins countered with his

---

**1.** Dr. Koenigsberg billed Allstate for his review of the MRI on May 17, 2009; Allstate paid the bill with a check dated May 29, 2009 [D.E. 71–3 at 5].

**2.** Though Plaintiff refers to Landau's report in his Statement of Facts [D.E. 67 ¶¶ 62–64], the report has not been included in the record before the Court.

own Proposal of Settlement for $20,000 [D.E. 71–27].

Wiggins finally had arthroscopic surgery on his knee on November 3, 2010 [D.E. 67–30]. According to Michelson's deposition, Dr. Corces agreed to perform the surgery pursuant to a "letter of protection" under which Wiggins did not have to pay anything out-of-pocket [D.E. 68–2 at 17; D.E. 77–7 at 6].

The suit on the coverage action proceeded to trial. On July 18, 2011, the parties filed a joint stipulation in that action in which Allstate stipulated that Wiggins sustained a medial meniscus tear in the automobile accident, and that this was a permanent injury [D.E. 57–1]. The parties also stipulated that Wiggins had incurred past medical expenses of $36,052.25. *Id.* At trial, the jury awarded Wiggins $36,052.25 in past medical damages, but only $5,000 in past noneconomic damages and nothing for future noneconomic damages [D.E. 71–28]. Subsequently, the trial judge granted Wiggins' motion for additur and awarded Wiggins an additional $10,000 for past noneconomic damages and $45,000 for future noneconomic damages [D.E. 57–2]. However, Allstate did not agree to the additur and opted for a new trial on damages [D.E. 57–3]. At the second trial, on November 29, 2012, Wiggins was awarded $20,000 for past noneconomic damages and $5,000 for future noneconomic damages, for a total verdict of $61,052.25 [D.E. 71–29]. The trial judge then entered a Partial Final Judgment in favor of Wiggins in the amount of $10,000, the limit of Allstate's underinsured motorist coverage [D.E. 71–30].[3]

On September 18, 2013, Wiggins filed the above-styled action alleging that All-state acted in bad faith when it refused to tender the underinsured motorist limits despite the medical evidence of a meniscal tear in his right knee [D.E. 1]. A Second Amended Complaint, filed May 8, 2014, is now the operative complaint [D.E. 15].

In its Motion for Summary Judgment, Allstate argues that there is no evidence in the record from which a reasonable jury could conclude that Allstate acted with a "conscious disregard or indifference to its obligations under the insurance contract" when it declined to tender the underinsured policy limits [D.E. 70]. Wiggins, on the other hand, argues that the evidence in the record is so overwhelming that the Court should grant summary judgment in his favor [D.E. 66].

## II. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). And any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or

---

**3.** The jury verdict of $61,052.25 was set-off by the $10,000 in PIP insurance paid on behalf of Wiggins and by the $15,000 settlement with State Farm, leaving a remaining jury award of $36,052.25, which exceeds the $10,000 limit of the Allstate underinsured motorist policy—and the Partial Final Judgment—by $26,052.25.

other materials...." Fed.R.Civ.P. 56(c)(1)(A). The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta,* 520 F.3d 1269, 1274 (11th Cir.2008) (quotation marks and citations omitted). At the summary judgment stage, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

Finally, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a sufficient showing to establish the existence of an element essential to [his] case, and on which [he] will bear the burden at trial.'" *Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 805–06, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, "[i]f the non-movant ... fails to adduce evidence which would be sufficient ... to support a jury finding for the non-movant, summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1370 (11th Cir.1997) (citation omitted).

For issues for which the movant would bear the burden of proof at trial, the party seeking summary judgment "must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–16 (11th Cir.1993) (emphasis in original).

## III. Analysis

Under Florida law, an insured may assert a claim for first-party bad faith against an insurer for "[n]ot attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests." Fla. Stat. § 624.155(1)(b)(1). Before pursuing a claim under this statute, an insured must first provide 60 days' written notice to the insurer, to allow the insurer to correct the circumstances giving rise to the claim. *See* Fla. Stat. §§ 624.155(3)(a) & (3)(d). To cure a violation, the insurer must tender "the amount owed pursuant to the express terms and conditions of the policy." *Talat Enters., Inc. v. Aetna Cas. & Surety Co.,* 753 So.2d 1278, 1282 (Fla. 2000).

■■■ To demonstrate good faith, an insurer "must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so. Because the duty of good faith involves diligence and care in the investigation and evaluation of the claim against the insured, negligence is relevant to the question of good faith." *Berges v. Infinity Ins. Co.,* 896 So.2d 665, 669 (Fla.2004) (quoting *Boston Old Colony Ins. Co. v. Gutierrez,* 386

So.2d 783, 785 (Fla.1980)).[4]

■ In examining a bad faith claim, the factfinder must examine the insurer's "entire conduct in the handling of the claim, including the acts or omissions of [the insurer] in failing to ensure payment of the policy limits within the time demands." *Id.* at 672. Generally, the question of an insurer's bad faith is one for the jury. *Id.* at 672–73. Whether an insurer has acted in bad faith in handling claims is determined under the "totality of the circumstances" standard. *Id.* at 680. Under this standard, the court should consider the following factors: (1) whether the insurer was able to obtain a reservation of the right to deny coverage if a defense were provided; (2) efforts or measures taken by the insurer to resolve the coverage dispute promptly or in such a way as to limit any potential prejudice to the insureds; (3) the substance of the coverage dispute or the weight of legal authority on the coverage issue; (4) the insurer's diligence and thoroughness in investigating the facts specifically pertinent to coverage; and (5) efforts made by the insurer to settle the liability claim in the face of the coverage dispute. *Pozzi Window Co. v. Auto–Owners Ins.*, 446 F.3d 1178, 1188 (11th Cir.2006) (citing *State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So.2d 55, 63 (Fla.1995)).

## A. Allstate's Motion for Summary Judgment

■ Allstate's Motion for Summary Judgment focuses on the narrow issue of the "permanency" of Wiggins' injury [D.E.

70 at 12–14]. Under Florida law, "the legal liability of an uninsured motorist coverage insurer does not include damages in tort for pain, suffering, mental anguish, and inconvenience," unless the injury consists of (a) significant and permanent loss of an important bodily function; (b) permanent injury within a reasonable degree of medical probability, other than scarring or disfigurement; (c) significant and permanent scarring and disfigurement; or (d) death. Fla. Stat. §§ 627.727(7) & 627.737(2)(a)-(d). Allstate incorporated this provision into the insurance policy under which it insured Wiggins [*see* D.E. 15–1 at 40]. Therefore, the Allstate policy does not provide coverage for noneconomic damages absent a showing that the insured suffered loss of an important bodily function, permanent injury, significant scarring or disfigurement, or death.

In its motion for summary judgment, Allstate argues that Wiggins failed to provide the insurer with sufficient evidence that he suffered a permanent injury before he filed his Civil Remedy Notice [D.E. 70 at 12–17]. In the absence of a permanent injury, Allstate argues, Wiggins was entitled to recover only his economic damages. *Id.* at 12. And, at the time Wiggins demanded the underinsured policy limits, he had only $4,455 in outstanding out-of-pocket expenses—well below the $15,000 then available to Wiggins under the bodily injury limits of the tortfeasor's State Farm policy. *Id.* at 14. Allstate argues that no reasonable jury could conclude that it acted in bad faith in refusing to pay the underinsured policy limits under these cir-

---

4. In its papers, Allstate asserts that a bad faith claim requires a showing of the insurer's "conscious disregard or indifference to the rights of the insured," citing *Auto Mut. Indem. Co. v. Shaw*, 134 Fla. 815, 816, 184 So. 852 (Fla.1938) [D.E. 81 at 9]. *Shaw* does not contain the language cited by Allstate, nor does it give any meaningful definition to the

bad faith standard. *See Liberty Mut. Ins. Co. v. Davis*, 412 F.2d 475, 479 (5th Cir.1969) (discussing *Shaw's* "ambivalent language" in adopting the "prevailing rule ... that the insurer must act in good faith toward the assured in an effort to negotiate a settlement").

cumstances. *Id.* In response, Wiggins argues that he supplied Allstate with medical records showing that he suffered from a meniscal tear that required surgery, and that this information was sufficient to establish that he suffered a permanent injury from the auto accident [D.E. 74]. Wiggins also casts this issue as a red herring, because Allstate conceded in the underlying action that Wiggins suffered a permanent injury, and that the medical expenses exceeded the coverage limits. *Id.* at 2, 5.

About two months before filing his Civil Remedy Notice, Wiggins provided Allstate with records of his visits with Dr. Shapiro and a radiology report by Dr. Christie in which she concluded, based on a review of MRI films, that Wiggins had a medial meniscal tear [D.E. 71–6 at 56–63]. And on April 16, 2009, Wiggins provided Allstate with the MRI films and with the evaluation of Dr. Corces, who identified an "internal derangement of the knee" and a medial meniscal tear and recommended arthroscopic surgery [D.E. 71–14 at 4–6]. Wiggins argues that this was sufficient evidence to show that he suffered a permanent injury within the meaning of the insurance policy and Fla. Stat. § 627.737(2)(b) [D.E. 74 at 4–6, 9–10].

Although Allstate had medical records and reports from Dr. Christie and Dr. Corces, neither doctor made an explicit determination that Wiggins had suffered a permanent injury. Allstate argues that this is fatal to Wiggins' claim, relying on *Harris v. Geico Gen. Ins. Co.,* 961 F.Supp.2d 1223, 1230–32 (S.D.Fla.2013). In *Harris,* the court found that a bad-faith action fails where the plaintiff failed to produce medical expert testimony indicating that the plaintiff's injuries were permanent. *Id.* The *Harris* court relied largely on *City of Tampa v. Long,* in which the Florida Supreme Court held that, to establish a permanent injury "within a reason-

able degree of medical probability" under Florida's No-Fault Law, a "plaintiff must also present expert medical testimony to establish the existence and permanency of the alleged injury." *City of Tampa v. Long,* 638 So.2d 35, 37–38 (Fla.1994). But this approach appears to conflate the standard for establishing insurance *coverage* under Fla. Stat. § 627.737(2)(b) at trial with the standard for determining whether an insurer acted in good faith in denying a claim. As Allstate has noted [D.E. 70 at 14], "[c]ritical to the elements of a bad faith cause of action are knowledge and/or delay on the insurance company's part. At the point in time when liability has become reasonably clear, failure to pay may subject the insurance company to a judgment in excess of policy limits." *316, Inc. v. Maryland Cas. Co.,* 625 F.Supp.2d 1187, 1192 (N.D.Fla.2008). Thus, the salient issue is not whether plaintiff has produced medical testimony of a permanent injury *at trial,* but whether, at the time the insurer denied plaintiff's claim, the insurer had sufficient information to determine that plaintiff suffered a permanent injury within a reasonable degree of medical probability, such that the insurer's liability was then reasonably clear.

As discussed above, at the time that Wiggins submitted his Civil Remedy Notice, Allstate had copies of the MRI images of his right knee, a report from Dr. Christie concluding that he suffered from a medial meniscal tear, and an evaluation from Dr. Corces that also concluded that Wiggins had a meniscal tear that required surgery [D.E. 71–14]. The question is whether a reasonable jury could conclude that this was sufficient to establish a permanent injury within a reasonable degree of medical probability. Allstate argues that none of the medical documentation provided before the Civil Remedy Notice was filed on May 5, 2009, established that Wiggins had a permanent injury, because

there was no explicit finding of permanency by Wiggins' physicians [D.E. 70 at 12–13]. However, in her deposition, Falcon, Allstate's claims adjuster, said a recommendation for surgery is a factor the insurer would consider in determining whether there has been a showing of permanency, and that surgery may lead to a permanency rating [D.E. 68–3 at 14–15].[5] Based on this record, the Court finds that there is a genuine issue of material fact as to this issue, making this a triable matter for the jury.

■ Even if the Court were to find that there was no evidence of a permanent injury, this would only be relevant to any claims for noneconomic damages. Wiggins argues that Dr. Corces' report put the insurer on notice that surgery was recommended, and that the cost of surgery would exceed the underinsured motorist policy limits even after the tortfeasor's bodily injury insurance was exhausted [D.E. 74 at 5–8]. Allstate argues that it acted reasonably in determining that medical expenses would not exceed the tortfeasor's policy limits, because at the time Civil Remedy Notice had been filed Wiggins had not committed to undergo the surgery [D.E. 70 at 13–14]. And while Wiggins explains that he delayed the surgery because he could not pay for it without the insurance proceeds [D.E. 74 at 8], Allstate submits that Wiggins could have received Medicaid benefits to cover the surgery, or entered into a Letter of Protection with Dr. Corces, as he later decided to do [D.E. 76 at 7]. Consequently a factual dispute bearing on the reasonableness of Allstate's decision not to tender the policy limits to Wiggins exists: "[W]here material issues of fact which would support a jury finding of bad faith remain in dispute, summary judgment is improper." *Berges*, 896 So.2d at 680. For these reasons, Allstate's Motion for Summary Judgment is DENIED.

## B. Wiggins' Motion for Summary Judgment

In his Motion for Summary Judgment, Wiggins argues that Allstate was provided with sufficient information to determine that Wiggins had a valid claim, and that Allstate demonstrated bad faith by failing to include Dr. Corces' recommendations in the initial Colossus assessment and by discounting Dr. Christie's evaluation of the MRI results [D.E. 66 at 7–15]. In response, Allstate highlights evidence that it says demonstrates that it acted reasonably in handling Wiggins' claim. Specifically, Allstate asserts that its adjusters were justifiably skeptical of Dr. Christie's evaluation because she had a "questionable" history treating accident victims [D.E. 76 at 7; D.E. 68–4 at 9]. Allstate further argues that it acted in good faith in relying on the medical opinion of Dr. Koenigsberg,

---

5. On January 21, 2010, Dr. Stephen Brown, a physician hired by Allstate's counsel in the underlying coverage action, concluded that the November 2008 MRI images did show a meniscus tear in Wiggins' knee [D.E. 71–21]. Based on Brown's evaluation, an Allstate claims adjuster made a revised assessment of Wiggins' claim on February 22, 2010, and concluded that Wiggins had "permanent impairment as a result of injuries sustained in this accident" [D.E. 67–28 at 4]. The claims adjuster also sought permission to tender the $10,000 policy limit [D.E. 71–3 at 7]. There is nothing in the record indicating that any of Wiggins' physicians had made an explicit finding of permanency at the time of Dr. Brown's evaluation; indeed, another Allstate expert, Dr. Salvador M. Ramirez, had found "no evidence of permanent impairment" four months before Dr. Brown's diagnosis [D.E. 71–20]. However, given Allstate's conclusion in February 2010 that Wiggins had a permanent injury based on the 2008 MRI, a reasonable jury could find that Allstate had sufficient information on May 5, 2009, to find a permanent injury at that time, even in the absence of a finding of permanent injury by a physician.

who reviewed the MRI films and saw no evidence of a meniscal tear [D.E. 76 at 13]. After viewing the facts in the light most favorable to Allstate as the nonmoving party, the Court finds that a reasonable jury could find that Allstate acted in good faith in handling Wiggins' claim. Therefore, Plaintiff's Motion for Summary Judgment is DENIED.

## IV. Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment [D.E. 70] is DENIED, and Plaintiff's Motion for Summary Judgment [D.E. 66] is DENIED.