[Civ. No. 10830. Third Dist. Nov. 18, 1964.]

BETTY J. CRITZ, Plaintiff and Appellant, v. FARMERS INSURANCE GROUP, Defendant and Respondent.

Clifford R. Lewis for Plaintiff and Appellant.

Kroloff, Brown, Belcher & Smart, Richard Belcher and William B. Boone for Defendant and Respondent.

FRIEDMAN, J.—Plaintiff Betty Critz was a passenger in an automobile driven by her husband. They were involved in a collision with an automobile driven by David Arnold. Arnold lost control of his vehicle while trying to negotiate a curve; his automobile crossed over to the opposite side of the road and crashed head-on into the Critz car. Mrs. Critz received numerous injuries, including the loss of sight in one eye and fractures of the neck and jaw. Arnold had liability insurance issued by defendant Farmers Insurance Group, with a coverage limit of $10,000 for injuries to one person.

Date of the accident was February 19, 1960. Defendant commenced an investigation of the accident. Almost five months after the accident, on July 8, 1960, plaintiff offered to settle her claim against Arnold for $10,000, the policy amount. The offer was made through Clifford Lewis, a Sacramento attorney, and took the form of a letter which required acceptance or rejection within one week. Without notifying Arnold of the offer, defendant replied with a counteroffer of $8,250.

At that point Mr. Lewis prepared a document and secured David Arnold's signature to it. The document recited that Mrs. Critz' settlement offer had been unreasonably rejected by Arnold's insurer and subjected Arnold to potential personal liability in excess of the policy limit. The document purportedly assigned to Mrs. Critz any right of action Arnold might have against his insurance company. In it Mrs. Critz undertook to hold Arnold free and harmless from all efforts to collect an injury judgment from him personally.

Through Mr. Lewis, plaintiff then filed an injury suit against Arnold. In ignorance of the purported assignment, Farmers Insurance Group undertook defense of the suit. Several months later the insurance company learned of the assignment. It then offered to settle the case for $10,000 but Mrs. Critz refused. The action then went to trial. The defense offered no evidence to exonerate Arnold as the culpable driver except evidence tending to show that plaintiff's husband had been under the influence of alcohol at the time of the accident. The jury returned a $48,000 verdict against Arnold.

In the present suit Mrs. Critz seeks recovery of $38,000 from Farmers Insurance Group in her role as asserted assignee of Arnold. Gravamen of the complaint is the charge

that the insurance company rejected the $10,000 settlement offer with a view only to its own financial interest and without regard to its obligation to protect David Arnold. By stipulation, there was a preliminary trial under an agreed statement of facts, aimed solely at adjudication of the assignment's validity. The trial court held that the assignment was void. Judgment for defendant was entered and this appeal followed.

The stipulated facts approximate the narrative description given above. An additional circumstance, stipulated only for the purpose of the preliminary trial, may be worthy of note— that at the time of the July 8 settlement offer, Mr. Lewis represented Mrs. Critz only for the purpose of presenting the offer, and that she employed him on a contingency fee basis only after rejection of the offer.

The agreed statement was supplemented by copies of two reports made to defendant by D. E. Silker of its Sacramento claims office. One report dated March 14, 1960, less than a month after the accident, stated in part: ''This appears to be an obvious case of liability. Injuries to Mrs. Critz are very serious and it appears her claim will exceed our policy limits. I have informed Mr. Critz we had a minimum policy; in fact my primary reason for keeping this under control was by making the approach that we wanted to save something on our policy and if he secured the services of an attorney, he would be fortunate to get his wife's expenses. In this respect, he believes his medicals will exceed or approach $5,000.''

In a later report, dated June 13, 1960, Silker told his company: ''This appears to be a case of liability. Even though the claimant [Mr. Critz] had been drinking, we have been unable to locate evidence that this contributed to the accident. I noted he was on his way to the Olympics when the accident occurred.

''It is obvious that Mrs. Critz's case has a value far in excess of our limits and I suggest a settlement figure of $8250. As indicated before, I have advised the family that they could not expect the policy on her case.''

■ Without regard to a policy limit on liability, an insurer may be liable for the entire amount of a judgment against its insured if it has been guilty of bad faith in refusing an offer of settlement within the policy limit. An authoritative statement of the rule appears in *Comunale* v. *Traders & General Ins. Co.*. 50 Cal.2d 654, 658-659 [328 P.2d 198]: ''There is an implied covenant of good faith and fair dealing

in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement. [Citation.] This principle is applicable to policies of insurance. [Citation.] . . . [T]he implied obligation of good faith and fair dealing requires the insurer to settle in an appropriate case although the express terms of the policy do not impose such a duty.

"The insurer, in deciding whether a claim should be compromised, must take into account the interest of the insured and give it at least as much consideration as it does to its own interest. [Citation.] When there is great risk of a recovery beyond the policy limits so that the most reasonable manner of disposing of the claim is a settlement which can be made within those limits, a consideration in good faith of the insured's interest requires the insurer to settle the claim. Its unwarranted refusal to do so constitutes a breach of the implied covenant of good faith and fair dealing."

The rule is considered and applied to varying situations in *Martin* v. *Hartford Acc. & Indem. Co.*, 228 Cal.App.2d 178 [39 Cal.Rptr. 342]; *Palmer* v. *Financial Indem. Co.*, 215 Cal. App.2d 419 [30 Cal.Rptr. 204]; *Hodges* v. *Standard Acc. Ins. Co.*, 198 Cal.App.2d 564 [18 Cal.Rptr. 17]; *Davy* v. *Public National Ins. Co.*, 181 Cal.App.2d 387 [5 Cal.Rptr. 488]; *Ivy* v. *Pacific Auto. Ins. Co.*, 156 Cal.App.2d 652 [320 P.2d 140]; and *Brown* v. *Guarantee Ins. Co.*, 155 Cal.App.2d 679 [319 P.2d 69]. (See also Note, *Duty of Liability Insurer to Settle or Compromise*, 40 A.L.R.2d 168; Note 10 Hastings L.J. 198.)

▮ The policyholder's damage claim against the insurer is assignable. (*Comunale* v. *Traders & General Ins. Co., supra*, 50 Cal.2d at p. 661; *Brown* v. *Guarantee Ins. Co., supra*, 155 Cal.App.2d at pp. 693, 695; see Note 46 Cal.L.Rev. 633.) In this case the defense asserts that David Arnold had no existing cause of action against it when he made his purported assignment to Mrs. Critz; that a possibility, a merely potential chose in action, cannot be assigned (citing Civ. Code, § 1045, and *Orkow* v. *Orkow*, 133 Cal.App. 50 [23 P.2d 781]); thus, that Arnold possessed nothing to transfer to Mrs. Critz but a potential, inchoate claim which could not be the subject of an assignment. In any event, defendant contends that such an assignment violates public policy and is for that reason void.

The assignment from Arnold to Mrs. Critz represents an unorthodox tactic which has not previously confronted the

courts.[1] Its novelty lies in its timing. In the fairly standardized situation, the policyholder. assigns his damage claim to the injured person after the latter recovers a judgment exceeding the policy limit; or, being driven into bankruptcy by the personal judgment against him, is succeeded by the trustee in bankruptcy, who then files suit against the insurer or assigns the cause of action to the judgment creditor. (See, for example, *Comunale* v. *Traders & General Ins. Co., supra,* 50 Cal.2d 654; *Martin* v. *Hartford Acc. & Indem. Co., supra,* 228 Cal.App.2d 178.) Here, in contrast, David Arnold had not been fastened with an excess judgment, had not even been named as formal defendant in a personal injury suit, when he executed the assignment document.

Some courts have held that the insured has no cause of action against his insurance company until such time as he suffers and satisfies a judgment in excess of the policy limit. This view has been rejected in California and a number of other states. (See cases cited 40 A.L.R.2d at pp. 190-195.) In *Brown* v. *Guarantee Ins. Co., supra,* 155 Cal.App.2d at page 690, the court says: ". . . logic and reason support the contrary view that the insured's cause of action arises when he incurs a binding judgment in excess of the policy limit." Defendant relies upon the quoted statement to support the argument that its insured, having incurred no judgment at the time of the attempted assignment, could not make an effective assignment. The court's remark was made without reference to the problem of assignability. The court meant only that prepayment of the judgment was not a requisite to suit against the insurer; not that an assignment could not possibly precede the personal injury judgment.

By the terms of its policy the liability insurer reserves control over the lawsuit and the settlement procedures. (*Comunale* v. *Traders & General Ins. Co.,* 50 Cal.2d at p. 660; *Ivy* v. *Pacific Auto. Ins. Co., supra,* 156 Cal.App.2d at p. 660.) ▇ An offer to settle for a sum approaching the monetary limit on liability confronts the insurer with a conflict of interest, a conflict described in some detail in *Brown* v. *Guarantee Ins. Co., supra,* 155 Cal.App.2d at pages 682-683. In brief, by rejecting the settlement, the insurer may subject its policyholder to the risk of personal liability

---

[1]Our examination of the comprehensive A.L.R. annotation (40 A.L.R. 2d § 9, p. 168, *Who May Recover: Parties*) and its supplements indicates that no reported case has involved an assignment taken under the circumstances presented here.

far exceeding the policy limit; by accepting it, the company may be paying a sum greater than the minimum possible settlement. Confronted with such a conflict, the insurer is obligated to give the interests of its policyholder at least as much consideration as its own. (*Comunale* v. *Traders & General Ins. Co.*, 50 Cal.2d at p. 659; see 7A Appleman, Insurance Law and Practice, § 4711, p. 553.)

It is said that the insurer's failure to consider the interests of its insured justifies a finding of bad faith. (*Palmer* v. *Financial Indem. Co., supra*, 215 Cal.App.2d at pp. 428, 432; *Hodges* v. *Standard Acc. Ins. Co., supra*, 198 Cal.App.2d at p. 577.) While this generalization is appropriate for appellate court use, it is too diffuse for the needs of trial court adjudication. ■ Bad faith implies unfair dealing rather than mistaken judgment or poor prognostication. (See *Davy* v. *Public National Ins. Co., supra*, 181 Cal.App.2d at p. 396; *Hodges* v. *Standard Acc. Ins. Co., supra*, 198 Cal.App.2d at p. 574.) Actual adjudication should involve more detailed scrutiny. ■ The excellent opinion of Justice Fox in the *Brown* case, *supra*, enumerates the principal factors upon which the adjudication of bad faith should turn: ". . . the strength of the injured claimant's case on the issues of liability and damages; attempts by the insurer to induce the insured to contribute to a settlement; failure of the insurer to properly investigate the circumstances so as to ascertain the evidence against the insured; the insurer's rejection of advice of its own attorney or agent; failure of the insurer to inform the insured of a compromise offer; the amount of financial risk to which each party is exposed in the event of a refusal to settle; the fault of the insured in inducing the insurer's rejection of the compromise offer by misleading it as to the facts; and any other factors tending to establish or negate bad faith on the part of the insurer." (*Brown* v. *Guarantee Ins. Co., supra*, 155 Cal.App.2d at p. 689.)

This enumeration has been quoted with approval in later decisions. (*Palmer* v. *Financial Indem. Co., supra*, 215 Cal. App.2d at p. 429; *Hodges* v. *Standard Acc. Ins. Co., supra*, 198 Cal.App.2d at p. 572.) Its embodiment in jury instructions was approved in *Davy* v. *Public National Ins. Co., supra*, 181 Cal.App.2d at pages 401-402.

■ Good or bad faith is a question of fact in each case. (*Martin* v. *Hartford Acc. & Indem. Co., supra*, 228 Cal. App.2d at p. 182; *Davy* v. *Public National Ins. Co., supra*, 181 Cal.App.2d at p. 400.) Every suit against an insurance company alleging a bad faith refusal to settle necessarily

results from a breakdown of settlement negotiations followed by disposition of the personal injury claim at the hands of jury or judge. Failure to settle may occur late or early in the game. Sometimes negotiations are held open almost to the time the jury returns with its verdict; sometimes the contending sides agree to disagree even before the accident suit is filed. ■ Certainly, the extent of negotiations preceding the breakdown, the timing of the insurer's rejection in relationship to the sequence of accident, commencement of suit and trial are elements in the fact trier's individualized adjudication of good or bad faith. ■ That rejection of the compromise offer happened early rather than late, that it preceded judgment or trial or even commencement of suit, does not preclude a finding of bad faith. ■ Assuming bad faith, the breach of the insurer's obligation occurs at the time when it indulges in the unwarranted rejection of a reasonable compromise offer within the policy limits. (*Comunale* v. *Traders & General Ins. Co., supra,* 50 Cal.2d at p. 659; *Palmer* v. *Financial Indem. Co., supra,* 215 Cal.App.2d at p. 428.)

■ Defendant urges that a charge of bad faith cannot rest on the insurer's refusal to accept immediately an initial settlement offer made before commencement of suit. It relies on the following dictum in *Hodges* v. *Standard Acc. Ins. Co., supra,* 198 Cal.App.2d at page 576: "The time when the issue of bad faith of the insurer must be measured is immediately prior to, or during, the trial of the personal injury action resulting in the verdict in excess of the policy limits."

In all realism, rejection of an initial settlement offer is frequently regarded as a preliminary bargaining tactic, not as a breakoff of negotiations. One side or the other may reappraise its position and reopen discussions. Claims are frequently settled after an initial rejection. Once suit is filed, the ultimate choice between settlement and conflict usually occurs during the period preceding the trial date. The statement in the *Hodges* opinion refers to the usual, but not the inevitable, point when negotiations break off. The injured party, however, is under no duty to keep negotiations open after rejection of an early settlement offer. He and the insurer deal at arm's length. He may take an initial rejection at face value and choose thereafter to submit his claim to the uncertainties of litigation. As noted in the *Martin* case, *supra,* 228 Cal.App.2d at page 184, the isolated sentence

from the *Hodges* opinion was not intended to alter the essential test of good faith attending the rejection. Even if the insurer attempts to resume negotiations by a belated offer of the policy limit, that action does not necessarily relieve it of the onus of an earlier bad faith rejection. Where the potential value of the claim is large in relation to the policy limit, where the claimant's case is comparatively strong and the potential defendant's weak, rejection of an initial offer to settle at or near the policy limit may then and there constitute a breach of the implied covenant of good faith.

The one-week limitation attached to Mrs. Critz' $10,000 settlement offer does not preclude a finding of bad faith rejection by the insurer. According to the stipulated facts, Mrs. Critz had not yet entered into a contingent fee contract with Mr. Lewis. She was entitled to consider her own financial necessities, to make what she believed to be a reasonable compromise offer, to wait a week before subjecting herself to the potential cost of a contingent fee contract and thereafter to push a lawsuit with all the speed at her command. She had a right to attach a time limit to her offer, but the insurer was not bound by it. (*Martin* v. *Hartford Acc. & Indem. Co., supra,* 228 Cal.App.2d at p. 185.) Had the company needed more time for investigation, for a good faith assessment of the claim's value or for consultation with its policyholder, it might have chosen neither to accept nor reject her offer, but rather to suggest additional time. The company's investigation and evaluation had been completed, however. Once the counteroffer was made, Mrs. Critz and her counsel were entitled to regard it as an invitation to litigate.

Mrs. Critz' case had great strength from the liability standpoint and on the damage score as well. Arnold's automobile had been on the wrong side of the road when the collision occurred, and his defense was accordingly weak. Mrs. Critz' injuries included a fractured neck and jaw and the loss of vision in one eye. Experience tells us, as it must have told defendant's claim department, that—as jury verdicts go—the money value of such injuries runs high, far outstripping the $10,000 policy limit. (See Personal Injury Valuation Handbook (Cal. Ed.) Jury Verdict Research, Inc.) Had the liability limit been higher, the $10,000 settlement offer would have been a bargain, eagerly to be grasped by any prudent insurer. (See *Davy* v. *Public National Ins. Co., supra,* 181 Cal.App.2d at pp. 399-400.) Defendant had been in-

formed by its own claim agent that the case was one of "obvious liability"; that Mrs. Critz' case had a value far in excess of the policy limit; that medical expenses alone would approximate $5,000; that there was no evidence that drinking by the driver of the Critz car had contributed to the accident. Notwithstanding all these circumstances, defendant rejected the offer to settle at $10,000 and made an $8,250 counteroffer. It did not tell its policyholder of the offer and gave him no opportunity to protect himself by contributing to a settlement or by retaining an attorney. (See *Hodges* v. *Standard Acc. Ins. Co., supra,* 198 Cal.App. 2d at pp. 578-579.) The stipulated facts would justify a jury in finding that defendant had resolved the conflict by exposing Arnold, its policyholder, to potential liability running to tens of thousands of dollars in order to squeeze out a $1,750 saving for itself; that instead of giving the insured's interest as much consideration as its own, the insurance company had thrown its policyholder's interests to the four winds; that its rejection of the $10,000 offer constituted a complete breach of its obligation of good faith, with only the damage remaining to be ascertained.

A finding of completed breach, however, would not endow the policyholder with an immediately enforceable chose in action against the insurer. Uncertainty as to the fact of damage negatives existence of a cause of action. (*Walker* v. *Pacific Indem. Co.,* 183 Cal.App.2d 513, 517 [6 Cal.Rptr. 924].) The fact of damage would become fixed and the policyholder's cause of action arise when he incurred a binding judgment in excess of the policy limit. (*Brown* v. *Guarantee Ins. Co., supra,* 155 Cal.App.2d at p. 690.)

Prior to the *Comunale* decision, it was not clear whether the policyholder's claim against the insurer sounded in tort or contract. In California at least, the *Comunale* decision established breach of an implied covenant, that is, breach of contract, as the theoretical basis of the claim. (50 Cal.2d at p. 659.) That Arnold's claim against the insurer was incomplete at the time of the attempted transfer to Mrs. Critz is not crucial, in our view. Common law and statutory rules against assignment of expectations may prevent the transferee from immediate assertion of his claim. The attempted transfer of a future right may operate as an equitable assignment or contract to assign, which becomes operative as soon as the right comes into existence. (*Gintel* v. *Green,* 165 Cal.App.2d 723, 725 [332 P.2d 298]; *Pruden-*

*tial Ins. Co.* v. *Broadhurst,* 157 Cal.App.2d 375, 378 [321 P.2d 75] ; 5 Cal.Jur.2d, Assignments, § 27.) The modern tendency is to recognize assignment of a prospective right to arise under an existing contract. (Rest., Contracts, § 154; 6 Am. Jur.2d, Assignments, § 15.) As pointed out in *Prudential Ins. Co.* v. *Broadhurst, supra,* the principle is designed to give effect to the mutual intent of assignor and assignee. The real limits on assignability of future rights are those fixed by public policy, enunciated either by Legislature or court. (See 3 Williston on Contracts (3d ed.) § 413, p. 53; Rest., Contracts, § 151(b).)

Mrs. Critz as assignee did not file the present suit until she had secured her judgment against Arnold. Thus any lack of maturity characterizing Arnold's claim when the assignment document was executed is not of much moment. Defendant's first point of attack, prematurity of the attempted assignment, succeeds or fails by precisely the same public policy considerations which support or deny defendant's assertion that the Arnold-Critz agreement was illegal.

A major portion of today's litigation consists of personal injury actions defended by liability insurers. Settlement practices and timing have a direct effect on the quantity and flow of court business and thus on the administration of justice generally. Public policy permitting or proscribing tactical weapons developed by claimants and insurers should be shaped by two influences: (1) the public interest in encouraging settlements, and (2) fairness, that is, equalization of the contenders' strategic advantages.

The law favors settlements. (*Potter* v. *Pacific Coast Lumber Co.,* 37 Cal.2d 592, 602 [234 P.2d 16] ; *Brown* v. *Guarantee Ins. Co., supra,* 155 Cal.App.2d at p. 696.) Defendant correctly points out that recognition of its policyholder's prospective assignment to the injured claimant strengthens the latter in refusing to reopen settlement negotiations. The insurance company's bad faith rejection of a settlement offer may effectually wipe out the policy limit on liability. When the injured person takes over the policyholder's cause of action against the insurer, actual or only potential, he arms himself with a weapon of great strength. Fortified by the prospect of a successful damage suit against the policyholder, followed by a successful suit against the insurer, he may with comparative impunity reject all the insurer's efforts to renew settlement negotiations. Mrs. Critz, for example, might have been vastly more amenable to the $10,000 offer made after

her suit was filed had she not already possessed the document of assignment executed by Arnold.

To accept such an argument would permit an insurer to take advantage of its own close-fisted intractability in rejecting an earlier settlement offer. If the carrier knows that its rejection of an offer to settle within the policy limit may lead to such an assignment, it will weigh the offer more seriously and give greater consideration to the interests of its policyholder. To nullify the assignment discourages settlement just as much as upholding it. The policy favoring settlements is evenhanded, pushing the insurer no less than the injured claimant.

The claim is made that the assignment violates the policyholder's duty to cooperate with his insurer in defending the lawsuit. Certainly the assignment sharply affects the policyholder's motivations. As a potential target of personal liability exceeding the policy limit, his defensive interests were closely allied with the insurer's. Having executed an assignment such as the present, he may relax into neutrality or even smile benevolently upon the plaintiff's efforts.

The requirement of cooperation by the policyholder assumes that the insurer has complied in good faith with the conditions of the policy (*Jensen* v. *Eureka Casualty Co.*, 10 Cal.App.2d 706, 708 [52 P.2d 540] ; 45 C.J.S., Insurance, § 934, p. 1061). An insurer may be estopped to claim breach of a cooperation clause which has been induced by its own action. (*Eggleston* v. *Liberty Mut. Ins. Co.*, 144 Cal.App.2d 302 [300 P.2d 867] ; Note 70 A.L.R.2d 1197.)

When the insurer breaches its obligation of good faith settlement, it exposes its policyholder to the sharp thrust of personal liability. At that point, there is an acute change in the relationship between policyholder and insurer. The change does not or should not affect the policyholder's obligation to appear as defendant and to testify to the truth. He need not indulge in financial masochism, however. Whatever may be his obligation to the carrier, it does not demand that he bare his breast to the continued danger of personal liability. By executing the assignment, he attempts only to shield himself from the danger to which the company has exposed him. He is doubtless less friendly to his insurer than he might otherwise have been. The absence of cordiality is attributable not to the assignment, but to his fear that the insurer has callously exposed him to extensive personal liability. The insur-

er's breach so narrows the policyholder's duty of cooperation that the self-protective assignment does not violate it.

■ A related contention is that the assignment and covenant not to execute upon the judgment violate public policy by imparting a collusive character to the personal injury suit. In *Pellett* v. *Sonotone Corp.*, 26 Cal.2d 705 [160 P.2d 783, 160 A.L.R. 863], an injured plaintiff entered into a covenant exonerating one of several defendants from culpability, agreeing not to execute against that defendant and providing that the defendant would continue to defend the action until a verdict was reached. The court expressed disapproval of such an agreement, saying (26 Cal.2d at p. 713) : ''While the trial court did not find, and we cannot hold as a matter of law, that there was any fraud or collusion in this case, such an agreement might lead to a fraud upon the court by concealing the position of a party who is an important witness in the action. . . . Moreover, the validity of the agreement, as between the parties thereto, is not at issue herein.''

The agreement before us diverges materially from that confronting the court in the *Sonotone* case. Farmers Group has stipulated that it was aware of the assignment before Mrs. Critz's personal injury action went to trial. Thus David Arnold's position was not concealed from the insurance company or its trial counsel. Arnold was not paraded before judge and jury as a culpable defendant, following an agreement which exonerated him from negligence. Objective of the assignment agreement was not to procure from Arnold testimony favoring his adversary. (Cf., *Pellett* v. *Sonotone Corp.*, *supra,* dissent of Traynor, J., 26 Cal.2d at p. 715.) There is no claim that Arnold actually said or did anything which jeopardized defense of the lawsuit. Nothing in the assignment agreement impelled him toward false testimony. His motivation was to protect himself from potential personal liability flowing from the insurer's rejection of the $10,000 settlement offer. Mrs. Critz' motivation was to strengthen her position vis-à-vis an insurer which had forced her into the delay and expense of litigation. The alliance between these motivating forces did not result in a collusive lawsuit, either in terms of natural tendencies or actual results.

While liability insurers are the frequent targets of inflated injury claims, it often happens that the injured claimant is constrained by financial necessity to sacrifice part of his claim's value in the interest of an early cash settlement. The

advantages of time and solvency are on the insurer's side. When medical expenses are high and the policy limit is low, pressure to settle is accentuated. When a limited liability insurer rejects an offer to settle a damage case at much less than its reasonably appraised value, it not only exposes its policyholder to the possibility of serious personal liability but also trades on the inferior economic position of the injured claimant. If an assignable claim exists at all, it exists only because the insurer has previously breached its obligation of good faith toward its policyholder. "Unless plaintiff as assignee can convince the trier of fact that the carrier in this case did not exercise good faith, plaintiff cannot prevail." (*Martin* v. *Hartford Acc. & Indem. Co., supra,* 228 Cal. App.2d at p. 185.) To uphold an equitable assignment under such circumstances does not supply the injured party with a disproportionate or unfair advantage. In our opinion, the present assignment is not violative of public policy if in fact a bad faith rejection had already occurred. If, on the other hand, the carrier was not guilty of bad faith, the plaintiff-assignee will lose the lawsuit regardless of the public policy aspects of the assignment.

Insurance policy provisions frequently prevent assignment without consent of the insurer prior to a loss. (*Greco* v. *Oregon Mutual Fire Ins. Co.,* 191 Cal.App.2d 674, 682 [12 Cal.Rptr. 802].) Defendant asserts that the Arnold-Critz agreement attempted to assign the policyholder's rights before the latter had suffered any loss by an adverse judgment against him. The assertion is unavailing. A provision against assignment of rights under a policy does not preclude transfer of a cause of action for breach of the policy. (*Comunale* v. *Traders & General Ins. Co., supra,* 50 Cal.2d at pp. 661-662.)

One more contention should be noted. Defendant argues that the hold harmless clause, in effect a covenant not to execute against Arnold, prevented the latter from suffering any damage by reason of the personal judgment against him. If, as a trier of fact may find, the carrier violated its duty of good faith, the damage, however potential, occurred at that time. As noted in the *Ivy* case, *supra,* 156 Cal. App.2d at page 662, a covenant not to execute is not a release. (See also *Pellett* v. *Sonotone Corp., supra,* 26 Cal.2d 705.) It did not blot out the personal judgment against Arnold or extinguish his claim for breach of contract against the carrier.

We conclude that validity of the assignment turns on the identical fact determination as the claim itself—did the carrier act in good or bad faith when it rejected the offer to settle at the policy limit? If, after considering the circumstances of the rejection, the fact trier finds that the carrier acted in good faith, then Mrs. Critz must lose this suit without regard to validity of the assignment. If on the other hand, the fact trier finds that the rejection was characterized by bad faith, the assignment must be upheld.

 Because the assignment cannot be considered in isolation from the ultimate issue in the case, the preliminary trial on the question of assignability was abortive. The cause must be returned to the trial court for trial of that ultimate issue. We do not intend to hold, in advance of that trial, that the circumstances require a finding of either good faith or bad faith on the part of the insurance carrier. (See *Martin* v. *Hartford Acc. & Indem. Co., supra,* 228 Cal.App.2d at pp. 185-186.) Since the parties entered into a stipulation of fact only for the purpose of the preliminary trial, they should now be relieved of that stipulation.

The judgment is reversed and the cause remanded for proceedings consistent with this opinion.

Pierce, P. J., and Van Dyke, J.,* concurred.

Respondent's petition for a hearing by the Supreme Court was denied January 13, 1965. Traynor, C. J., and Burke, J., were of the opinion that the petition should be granted.

---

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.