[No. A051271. First Dist., Div. Four. Apr. 30, 1992.]

WALBROOK INSURANCE COMPANY LIMITED et al., Plaintiffs and Appellants, v.
LIBERTY MUTUAL INSURANCE COMPANY, Defendant and Respondent.

1448

**Counsel**

Sedgwick, Detert, Moran & Arnold, Roger W. Sleight and Frederick D. Baker for Plaintiffs and Appellants.

Lynch, Loofbourrow, Helmenstine, Gilardi & Grummer and David T. Loofbourrow, Jr., for Defendant and Respondent.

## OPINION

**PERLEY, J.**—A jury determined that a primary insurer was not guilty of bad faith when, having rejected pretrial offers to settle a claim against its insured within the limits of its policy, it entered into an agreement at trial which resulted in a judgment exceeding its policy limits and thus required a substantial payment by the insured's excess insurers. Concluding that the jury's verdict is supported by substantial evidence, and that no prejudicial instructional error was committed by the trial court, we affirm.

### BACKGROUND

On November 22, 1980, Lynn Cameron lost control of the Chevrolet sedan she was driving on a wet San Francisco street. The Cameron vehicle crossed over the center divider and collided with a smaller Honda being driven by Nancy Petersilge, a dermatology resident at the University of California Medical Center in San Francisco.

In April of 1981, suffering from what at the time seemed to be moderately severe physical and psychological injuries caused by the accident, Petersilge filed a complaint for damages against the driver and owners of the Cameron vehicle. Five months later Petersilge filed an amended complaint adding as an additional defendant Sears Roebuck and Company, which had installed at least two of the tires mounted on the Cameron vehicle at the time of the accident.

Although these tires may have been sold and installed by Sears, they were manufactured by the Armstrong Rubber Company. Its vendor arrangement with Sears obligated Armstrong to defend and indemnify Sears in lawsuits involving Armstrong's products. Pursuant to this arrangement, Sears tendered defense of the Petersilge action to Armstrong. The tender was accepted by Armstrong and its primary insurer, defendant Liberty Mutual Insurance Company. Defendant engaged a San Francisco law firm it regularly employed to conduct the defense. Sears became dissatisfied with this representation and requested that the defense be transferred to another firm experienced in handling litigation against Sears. Defendant agreed and the substitution of counsel was made. Attorney Bruce Nye assumed responsibility for defending Sears.

It was about this time—late 1982—that matters started to heat up. Nye immediately began an extensive and intensive program of investigation and discovery. Although some of its local employees grumbled privately at the expense, defendant authorized and paid for whatever Nye requested.

It appears that at approximately the same time that Sears was switching counsel, Petersilge made her first settlement demand—for $1 million, the limit of defendant's policy with Armstrong. This demand was rejected when the new counsel for Sears determined that at that time there was insufficient workup of the case to make an informed evaluation of its worth. Under the deadline of a February 1983 trial date, Nye moved rapidly to complete a frenetic discovery plan.

With respect to Petersilge's allegations that her injuries from the accident impaired her ability to practice medicine, the picture that soon emerged was mixed. Petersilge had deposition testimony that she had suffered permanent damage to her vision; brain damage; emotional difficulties; and that she faced an uncertain professional future. On the other hand, Sears could look to evidence that Petersilge had had psychological treatment prior to the accident; that she had no permanent brain damage; and that she had reasonably good prospects of resuming her career.

With respect to the issue of liability, Nye, Sears, and defendant believed the evidence was decidedly favorable. Petersilge alleged dual theories of liability: that Sears, having sold Cameron a pair of radial tires, mounted them on the front wheels of the vehicle when industry practice and Sears policy required (1) radials to be put on the rear wheels if—as Petersilge alleged—bias ply tires are on the front wheels, and (2) newer tires to be mounted on the rear wheels. A major obstacle to defense efforts to gather refuting evidence was the unavailability of the Cameron vehicle, which had been junked immediately after the accident. In the absence of this best evidence, Sears was forced to make do with enlarged and computer-enhanced photographs taken at the accident scene. Nevertheless, whereas Petersilge had only one expert willing to testify that there was a mix of radials and bias ply tires, Sears had up to eight witnesses that all of the tires were radials. Sears also developed evidence that, even if there was a tire mix, or if newer tires were mounted on the rear wheels, neither of these factors would necessarily have contributed to causing the accident. Moreover, Sears had evidence that the accident could well have been caused by Cameron driving at an unsafe (even if not illegal) speed. Much of this information came from considerably more extensive testing and accident reconstruction efforts than were conducted by Petersilge.

In light of his pretrial preparation, attorney Nye firmly believed that "the evidence supporting Sears . . . was overwhelming." Although recognizing the ominously large potential damages Petersilge might have in the abstract, all persons involved in defending Sears adamantly maintained that the case entailed little or no liability for Sears.

Within a week of the scheduled start of trial, and in accordance with Code of Civil Procedure section 998, Petersilge offered to settle for $984,999. Believing the case had a settlement value in the range of $150,000 to $200,000, Nye requested settlement authority up to the higher figure. Defendant refused but granted $50,000 settlement authority. On behalf of Sears, Nye made a statutory counteroffer of the $50,000, which was the anticipated "cost of defense" defendant expected to incur if the case was tried. Following a perfunctory settlement conference conducted under court auspices, defendant apparently and belatedly acceded to Nye's request, for in late February of 1983 defendant offered $200,000 to Petersilge.

The Petersilge action then began trailing on the trial calendar; the actual trial did not begin until February 1984. During this period Nye pressed ahead with further investigation. The results led him to conclude that "liability on this picture . . . [i]f anything . . . got better" for Sears.

Nor was it all quiet on the settlement front while the parties were awaiting a courtroom. At the beginning of March 1983, and in response to Sears's earlier offer of $200,000, Petersilge reduced her settlement demand slightly, to $925,000. At the end of that same month Petersilge's attorney put forward a pair of new settlement proposals. As recounted by Nye in a letter to Sears and defendant, the "first proposal involved a minimum payment . . . of $200,000, with a maximum potential recovery . . . of $1,000,000. The second suggestion was a payment of some amount of money more than $200,000 but less than $925,000, which plaintiff had previously demanded." Firmly believing that "there was no liability," that the case could be won, and that the case was worth no more than the $200,000 already offered and spurned, the defense rejected both proposals. Here matters stood until trial.

At trial, testimony opened and initially progressed without surprise to the defense. But any complacency there may have been was shattered when Petersilge's supervisor, reversing his prior position, testified that she would be dropped from the residency program the following week and would probably be unable to practice medicine due to her injuries. Although as an attorney, Nye could appreciate that this testimony went only to damages and not to the anterior issue of liability, he was keenly aware that it had "an immense emotional impact on the jury" and had the potential for shifting the odds decisively in Petersilge's favor. Sears raised its settlement offer to $500,000 about the time that Petersilge demanded the immediate payment of $1.7 million, this sum to be personally guaranteed by Nye. Both offer and demand were rejected.

On the final day of trial, just before the case went to the jury, Petersilge and Sears entered into an agreement suggested by Petersilge's attorney:

regardless of the jury's verdict, Petersilge would receive $250,000; how much more she received—up to the agreed maximum of $2.1 million—would be fixed by the verdict. Both sides waived their rights to move for a new trial and to appeal. Convinced it would win, Sears sent the case to the jury.

The jury returned a verdict of $2,660,315 for Petersilge. Pursuant to the settlement's recovery ceiling, a judgment for $2.1 million was entered against Sears. Despite being stunned by what it believed was a "runaway" verdict, and because there was no available means for challenging it, defendant paid its policy limit.

After satisfying the balance of almost $1.8 million remaining from the judgment and accrued interest, plaintiffs commenced this action. After much winnowing was accomplished by a number of pretrial rulings by the trial court, the case was submitted to the jury on the sole issue of whether defendant had breached its duty of good faith to Sears by refusing to settle Petersilge's claim within its policy limits. The jury found for defendant.

After judgment on the verdict was entered, plaintiffs, claiming that defendant's bad faith was established as a matter of law, moved for judgment notwithstanding the verdict. Plaintiffs also moved for a new trial by reason of (among other things) instructional error and insufficient evidence to support the verdict. The trial court made a pair of orders denying both motions.

Plaintiffs thereupon filed a timely notice of appeal from the judgment and the order denying their motion for judgment notwithstanding the verdict. These appeals are proper. (Code Civ. Proc., § 904.1, subds. (a), (d).) But plaintiffs' purported appeals from the orders denying their motions for summary judgment and for a new trial must be dismissed because these are not appealable orders. (*Shelter Creek Development Corp.* v. *City of Oxnard* (1983) 34 Cal.3d 733, 737, fn. 2 [195 Cal.Rptr. 361, 669 P.2d 948]; *Armenta* v. *Churchill* (1954) 42 Cal.2d 448, 451 [267 P.2d 303].)

REVIEW

I

The essential nature of plaintiffs' action against defendant can best be summarized by quoting from the opinion prepared by our former colleague Justice Sabraw and adopted by the Supreme Court:

"It is now well established that an insurer may be held liable for a judgment against the insured in excess of its policy limits where it has

breached its implied covenant of good faith and fair dealing by unreasonably refusing to accept a settlement offer within the policy limits. [Citations.] The insurer's duty of good faith requires it to 'settle within policy limits when there is substantial likelihood of recovery in excess of those limits.' . . . [¶] . . . [A]n insurer's duty to settle is derived from the implied covenant of good faith and fair dealing which is part of any contract. . . . ¶ . . . [¶] 'The insurer, in deciding whether a claim should be compromised, must take into account the interest of the insured and give it at least as much consideration as it does to its own interest. [Citation.] When there is great risk of a recovery beyond the policy limits so that the most reasonable manner of disposing of the claim is a settlement which can be made within those limits, a consideration in good faith of the insured's interest requires the insurer to settle the claim. Its unwarranted refusal to do so constitutes a breach of the implied covenant of good faith and fair dealing.' ■ [¶] It has been held in California and other jurisdictions that the excess carrier may maintain an action against the primary carrier for wrongful refusal to settle within the latter's policy limits. [Citations.] This rule, however, is based on the theory of equitable subrogation: Since the insured would have been able to recover from the primary carrier for a judgment in excess of policy limits caused by the carrier's wrongful refusal to settle, the excess carrier, who discharged the insured's liability as a result of this tort, stands in the shoes of the insured and should be permitted to assert all claims against the primary carrier which the insured himself could have asserted. . . . Hence, the rule does not rest upon the finding of any separate duty owed to an excess insurance carrier." (*Commercial Union Assurance Companies* v. *Safeway Stores, Inc.* (1980) 26 Cal.3d 912, 916-918 [164 Cal.Rptr. 709, 610 P.2d 1038] [editorial brackets omitted].) Having had to pay more than a million dollars to discharge Sears's liability to Petersilge, plaintiffs are entitled to maintain this action on the basis that their payment was the result of defendant's wrongful refusal to accept Petersilge's offers to settle her claim within the limits of defendant's policy.

■ This court has recognized that ordinarily "[w]hether the insurer has acted unreasonably, and hence in bad faith, in rejecting a settlement offer is a question of fact to be determined by the jury." (*Cain* v. *State Farm Mut. Auto. Ins. Co.* (1975) 47 Cal.App.3d 783, 792 [121 Cal.Rptr. 200].) This follows from the nature of the issue: "A determination respecting the presence or absence of good faith involves an inquiry into motive, intent and state of mind. Conclusions concerning such matters, in most cases, are founded upon inferences." (*Davy* v. *Public National Ins. Co.* (1960) 181 Cal.App.2d 387, 397 [5 Cal.Rptr. 488]; accord, *Palmer* v. *Financial Indem. Co.* (1963) 215 Cal.App.2d 419, 430 [30 Cal.Rptr. 204].) The question becomes one of law only when, because there are no conflicting inferences, reasonable minds could not differ. (*Marsango* v. *Automobile Club of So. Cal.*

(1969) 1 Cal.App.3d 688, 696 [82 Cal.Rptr. 92]; *Davy* v. *Public National Ins. Co., supra,* at p. 400; *Hodges* v. *Standard Accident Ins. Co.* (1961) 198 Cal.App.2d 564, 574 [18 Cal.Rptr. 17].) In denying plaintiffs' motions for summary judgment and for judgment notwithstanding the verdict, the trial court determined that plaintiffs' proof had not attained this level of certainty. Plaintiffs' third attempt to prevail on this point is its contention that defendant's bad faith appears as a matter of law. We agree with the trial court that the issue was appropriately left with the jury, whose decision on this issue is to be respected.

██ Insurers are required to act with good faith in dealings with their insureds. The courts of this state recognize that the concept of good faith possesses " 'an intangible and abstract quality with no technical meaning.' " (*Pugh* v. *See's Candies, Inc.* (1988) 203 Cal.App.3d 743, 763 [250 Cal.Rptr. 195].) One commentator sees the idea of good faith as having "no definite meaning of its own," but is commonly illustrated in a negative fashion, "by explaining what it is not." (Comment, *Sailing the Uncharted Seas of Bad Faith: Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1985) 69 Minn.L.Rev. 1161, 1165-1166, fn. 21.) Coming to the same conclusion, another observer notes that good faith "is a phrase which has no general meaning or meanings of its own, but which serves to exclude many heterogeneous forms of bad faith. . . . In a particular context the phrase takes on specific meaning, but usually this is only by way of contrast with the specific form of bad faith actually or hypothetically ruled out." (Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code* (1968) 54 Va.L.Rev. 195, 196, 201; see Rest.2d Contracts, § 205, com. d.) Looking to define bad faith is hardly less frustrating, for it too is recognized as an "amorphous concept" (*Silver Organizations, Ltd.* v. *Frank* (1990) 217 Cal.App.3d 94, 100 [265 Cal.Rptr. 681]) which "necessarily varies with the context" (*County of Inyo* v. *City of Los Angeles* (1978) 78 Cal.App.3d 82, 92 [144 Cal.Rptr. 71]) and thus has "no generally accepted 'correct' definition." (*Pugh* v. *See's Candies, Inc., supra,* at p. 763.)

As may be gathered, the issue of whether good faith was exercised covers a broad range of territory. The first California decision on the issue listed some of the specific factors which might be germane (most of which are recognized in BAJI No. 12.98 (Insurance Company's Obligations—Factors to Consider)), but the Court of Appeal made clear that consideration should also be given to "any other factors tending to establish or negate bad faith on the part of the insurer." (*Brown* v. *Guarantee Ins. Co.* (1957) 155 Cal.App.2d 679, 689 [319 P.2d 69, 66 A.L.R.2d 1202].) Since then, decisions of the Courts of Appeal have established that the litmus of good faith/bad faith is to be tested against the background of the totality of the circumstances in which

the insurer's disputed actions occurred. (See *Betts* v. *Allstate Ins. Co.* (1984) 154 Cal.App.3d 688, 707 [201 Cal.Rptr. 528]; *Merritt* v. *Reserve Ins. Co.* (1973) 34 Cal.App.3d 858, 876 [110 Cal.Rptr. 511]; *Critz* v. *Farmers Ins. Group* (1964) 230 Cal.App.2d 788, 796 [41 Cal.Rptr. 401, 12 A.L.R.3d 1142]; *Martin* v. *Hartford Acc. & Indem. Co.* (1964) 228 Cal.App.2d 178, 185 [39 Cal.Rptr. 342]; *Palmer* v. *Financial Indem. Co.*, *supra*, 215 Cal.App.2d 419 at p. 429; *Hodges* v. *Standard Accident Ins. Co.*, *supra*, 198 Cal.App.2d 564 at p. 572; *Davy* v. *Public National Ins. Co.*, *supra*, 181 Cal.App.2d 387 at pp. 394, 402.)

Although this totality of circumstances standard has not been expressly embraced by our Supreme Court, it has been adopted in all but name. In its first expression in this field, when it held that "the implied obligation of good faith and fair dealing requires the insurer to settle *in an appropriate case*," the court illustrated such a case as one involving "a great risk of liability" and "a great risk of recovery beyond the policy limits." (*Communale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 659-660 [328 P.2d 198, 68 A.L.R.2d 883], italics added.) This principle has subsequently been reiterated in slightly different form. When it stated that the implied covenant "imposes a duty on the insurer to settle a claim against its insured within policy limits whenever there is a substantial likelihood of a recovery in excess of those limits," the court called attention to "the victim's injuries and the probable liability of the insured" as factors to be considered "in evaluating the reasonableness of the settlement offer" made by the injured victim. (*Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 14-16 [123 Cal.Rptr. 288, 538 P.2d 744]; see *Critz* v. *Farmers Ins. Group*, *supra*, 230 Cal.App.2d 788 at p. 798 [rejecting settlement offer within policy limits may constitute bad faith "where the claimant's case is comparatively strong and the potential of defendant's weak"].) If "the test is whether a prudent insurer without policy limits would have accepted the settlement offer" (*Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 429 [58 Cal.Rptr. 13, 426 P.2d 173]), it is only to be expected that "a prudent insurer" evaluating whether it confronts "an appropriate case" for accepting a "reasonable" settlement offer, will look to the merits of the claim made against the insured, and to the insured's defenses, and thereby ascertain if there is "a great risk of a recovery" by the claimant. The relative weight of these factors—which are nebulous and imprecise by their very nature—will, of course, vary from case to case.

The approaches of the Supreme Court and the Courts of Appeal may differ in theoretical emphasis, but they dovetail in practical application. Both validate the trier of fact undertaking a wide-ranging inquiry into such intangibles as motive, knowledge, experience, and the ability to prophesy.

The two approaches recognize that the matter of good faith/bad faith may in specific instances be treated as an issue of law (see e.g., *Samson* v. *Transamerica Ins. Co.* (1981) 30 Cal.3d 220 [178 Cal.Rptr. 343, 636 P.2d 32] [summary judgment]; *Miller* v. *Elite Ins. Co.* (1980) 100 Cal.App.3d 739 [161 Cal.Rptr. 322] [directed verdict]), but will ordinarily be one of fact.

The following discussion will demonstrate that, because both sides had colorable positions, the trial court correctly entrusted resolution of the matter to the jury. The pertinent issue here therefore becomes whether the jury's verdict is supported by substantial evidence. (See *Crisci* v. *Security Ins. Co.*, *supra*, 66 Cal.2d 425 at pp. 431-432; *Northwestern Mut. Ins. Co.* v. *Farmers' Ins. Group* (1978) 76 Cal.App.3d 1031, 1053-1054 [143 Cal.Rptr. 415]; *Cain* v. *State Farm Mut. Auto. Ins. Co.*, *supra*, 47 Cal.App.3d 783 at pp. 790-793; *Marsango* v. *Automobile Club of So. Cal.*, *supra*, 1 Cal.App.3d 688 at pp. 696-697.)

Another former member of this court, Justice Devine, stated that an insurer has "the duty to give intelligent consideration to an offer of settlement, with reasonable investigation and a decision by persons reasonably qualified to decide upon the risks involved." (*Martin* v. *Hartford Acc. & Indem. Co.*, *supra*, 228 Cal.App.2d 178 at p. 183.) ▇ Defendant clearly satisfied this duty. It engaged qualified legal counsel selected by Sears, and financed the exhaustive investigation made by that counsel. Settlement offers made by Petersilge were carefully weighed by counsel and several layers of defendant's personnel at its local and home offices in light of that investigation. This was not a case where the insurer's attention was distracted with doubts as to coverage. (See pt. II(D), *post.*) Nor was it a case where the insurer disregarded its own internal evaluation of likely liability (see *Crisci* v. *Security Ins. Co.*, *supra*, 66 Cal.2d 425 at pp. 428, 432; *Critz* v. *Farmers Ins. Group*, *supra*, 230 Cal.App.2d 788 at p. 793) or overrode its insured's desire for a settlement. (See *Garner* v. *American Mut. Liability Ins. Co.* (1973) 31 Cal.App.3d 843, 850 [107 Cal.Rptr. 604].)

▇ Given that an insurer is required to make an informed decision on a settlement offer, the rejection of Petersilge's initial million-dollar offer, made at approximately the same time Sears changed counsel, must be excluded from consideration by reason of defendant's general lack of knowledge about the case. Plaintiffs conceded as much at trial. Similarly, because the duty of good faith compels acceptance of a settlement offer only if the offer is *within* the insurer's policy limits (see e.g., *Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau*, *supra*, 15 Cal.3d 9 at p. 16 and decisions cited), Petersilge's demand for $1.7 million—well in excess of defendant's policy limits of $1 million—is also to be put aside. The relevant scope of the

inquiry, both for the jury and here on appeal, is thus restricted to those settlement offers within defendant's policy limits presented after defendant became capable of making an informed decision to accept or reject them. The issue is whether the jury could conclude that defendant's rejection of the settlement offers received in February and March of 1983 evidenced good faith.

■■■ By the time at which defendant was able to make an informed evaluation of those offers, and even discounting the unanticipated disclosure at the impending trial that her career was effectively ended, Petersilge's claim could not be dismissed out of hand. The verdict eventually returned in her favor, although not conclusive proof of the value of her claim (see pt. II(C), *post*), is sufficient to establish that her claimed injuries were not fanciful. But if the factor of "the victim's injuries" (*Johansen v. California State Auto. Assn. Inter-Ins. Bureau, supra,* 15 Cal.3d 9 at p. 16) can be deemed obvious, the more important correlate factor of "the probable liability of the insured" (*ibid.*) was nothing like so certain. On behalf of Sears, a wealth of evidence had been amassed against Petersilge's tire-mix theory of liability. Although less impressive, the evidence compiled by defendant to meet Petersilge's improper mounting theory of liability was far from negligible or implausible. If either vein of this evidence were found credible by a trier of fact, the issue of damages would be moot. In light of its verdict, the jury must be deemed to have found that defendant had a justifiable belief there was neither a great risk nor a substantial likelihood of Petersilge recovering in excess of defendant's policy limits. (See *Crisci v. Security Ins. Co., supra,* 66 Cal.2d 425 at p. 432.)

The verdict also represents the jury's implicit determination that defendant's conduct was not motivated by "its own close-fisted intractability" in rejecting Petersilge's offers of settlement. (See *Critz v. Farmers Ins. Group, supra,* 230 Cal.App.2d 788 at p. 801.) Such a determination could rest upon evidence that defendant was willing to upgrade its valuation of Petersilge's claim and increase its reserve on the claim accordingly as new information and events came to light. This determination would in turn support the jury concluding that defendant's primary motivation was neither bad faith nor its own interests. (See *Crisci v. Security Ins. Co., supra,* 66 Cal.2d 425 at p. 432; *Davy v. Public National Ins. Co., supra,* 181 Cal.App.2d 387 at pp. 396-397.)

Viewed most strongly in favor of defendant (*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1087 [4 Cal.Rptr.2d 874]), the evidence is more than ample to support the verdict. (See *Northwestern Mut. Ins. Co. v. Farmers Ins. Group, supra,* 76 Cal.App.3d 1031 at pp. 1053-1054; *Cain v. State Farm Mut. Auto. Ins. Co., supra,* 47 Cal.App.3d 783 at pp. 790-792; *Marsango v.*

*Automobile Club of So. Cal.*, *supra*, 1 Cal.App.3d 688 at p. 696.) There being substantial evidence in support of the jury's verdict, plaintiffs' motion for judgment notwithstanding that verdict was properly denied by the trial court. (*Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 877-878 [151 Cal.Rptr. 285, 587 P.2d 1098].)

## II

Plaintiffs advance a number of claims of alleged instructional error committed by the trial court. Each of these claims will be discussed separately.

## (A)

■ Over plaintiffs' objection the trial court instructed the jury with a modified version of BAJI No. 12.97 to the effect that "the liability of an insurance company for failure to accept an offer of settlement within the policy limits of coverage cannot be based solely on a mistake in judgment or on its failure to predict correctly the outcome of a lawsuit arising out of such claim." Unlike plaintiffs we do not view the instruction as error.

The Supreme Court has never gone so far as to hold that the insurer's duty of good faith imposes "a categorical obligation on a carrier to accept a settlement demand regardless of cost." (*Continental Cas. Co.* v. *United States Fid. & Guar. Co.* (N.D.Cal. 1981) 516 F.Supp. 384, 389.) In fact, the court has twice declined to adopt what in effect would be a rule of strict liability for insurers who refuse settlement offers within policy limits. (See *Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau*, *supra*, 15 Cal.3d 9 at p. 17, fn. 6; *Crisci* v. *Security Ins. Co.*, *supra*, 66 Cal.2d 425 at pp. 430-431.) When the court stated that an insurer contemplating whether to accept a settlement offer "must take into account the interest of the insured and give it at least as much consideration as it does to its own interest" (*Communale* v. *Traders & General Ins. Co.*, *supra*, 50 Cal.2d 654 at p. 659), it did not intend that the insurer is required to give *no* consideration to its own interest. Insurance companies are businesses, not charities. No insurer is compelled "to jettison its own interests by accepting every offer of settlement within policy limits in order to achieve risk-free status for its assured." (*Merritt* v. *Reserve Ins. Co.*, *supra*, 34 Cal.App.3d 858 at p. 874.) This commonsense reality has been accepted from the time the covenant of good faith was first applied to contracts of insurance. (See *id.* at pp. 872-873 and decisions cited.)

Yet, if an insurer is not expected to throw open its coffers to any and every claim made against an insured, the insurer's rejection of a settlement offer must be based on something more substantial than "blind faith" (*Crisci* v.

*General Ins. Co., supra,* 66 Cal.2d 425 at p. 432) or the insurer "hiding its head in the sand." (*Betts* v. *Allstate Ins. Co., supra,* 154 Cal.App.3d 688 at p. 707.) The rejection must have a reasonable basis in terms of the investigation and qualifications of the persons making the decision. (See *Davy* v. *Public National Ins. Co., supra,* 181 Cal.App.2d 387 at p. 396.)

But an informed rejection is not required to be an infallible one. Almost a half century ago our Supreme Court stated in a different context that "mistaken judgment is not . . . the equivalent of bad faith." (*Neel* v. *Barnard* (1944) 24 Cal.2d 406, 418 [150 P.2d 177].) This precept, which was quickly incorporated in the emerging judicial recognition of an insurer's good faith duty to settle claims (see e.g., *Hodges* v. *Standard Accident Ins. Co., supra,* 198 Cal.App.2d 564 at p. 574; *Davy* v. *Public National Ins. Co., supra,* 181 Cal.App.2d 387 at p. 396), reflects the hard realities of litigation. "The act of appraising a case is, of course, not an exact science and there is room for a variety of honest judgments. . . . Experience shows that in looking ahead no one can predict what any particular jury will do." (*Hodges* v. *Standard Accident Ins. Co., supra,* at p. 575.) In derivative litigation of this nature, the crucial issue is not the insured's liability in the underlying litigation, but the basis for the insurer's decision to reject an offer of settlement. "[W]here it honestly believe[d] and ha[d] cause to believe that any probable liability [against the insured] will be less than the policy limits," an insurer holding that belief can be relieved of direct liability if a trier of fact subsequently concludes that the insurer's mistaken estimation "cannot be said to be so unrealistic, unfair, unintelligible, or dishonest as to amount to bad faith." (*Id.* at pp. 574-575.) This may be especially true where the insurer failed to anticipate that an "unusual, out-of-the-ordinary verdict" (*id.* at p. 575) was returned against the insured in the underlying litigation.

In short, so long as insurers are not subject to a strict liability standard, there is still room for an honest, innocent mistake. The trial court's instruction consequently does not qualify as error.

(B)

The trial court instructed the jury with BAJI No. 12.95 as follows: "The implied obligation of good faith and fair dealing in an insurance policy imposes a duty on an insurance company to accept the reasonable offer to settle a claim against the person insured if the offer is within the limits of the insurance coverage and if there is a substantial likelihood of recovery against the person insured for an amount in excess of the insurance coverage." After commencing their deliberations, the jury requested a definition of "substantial likelihood." Over objection by plaintiffs, the trial court instructed that the term meant "a strong probability."

■ Presenting an almost impossibly abstruse series of linguistic arguments, plaintiffs contend this was error. A line-by-line dissection of these arguments is fortunately obviated by the briefest review of existing and binding precedents. Our Supreme Court has already held that "substantial" is synonymous with "strong" (*Atchison etc. Ry. Co.* v. *Kings Co. Water Dist.* (1956) 47 Cal.2d 140, 144 [302 P.2d 1]), and that "likely" is synonymous with "probable." (*Hoy* v. *Tornich* (1926) 199 Cal. 545, 554 [250 P. 565]; accord *Horning* v. *Gerlach* (1934) 139 Cal.App. 470, 473 [34 P.2d 504].) With due allowance for the required adjectival and nounal transitions, "strong probability" is a permitted restatement of "substantial likelihood." Plaintiffs' claim of error fails accordingly.

### (C)

■ It has been repeatedly stated by our Supreme Court that "The size of the judgment recovered in the [underlying] personal injury action when it exceeds the policy limits, although not conclusive, furnishes an inference that the value of the claim is the equivalent of the amount of the judgment and that acceptance of an offer within those limits was the most reasonable method of dealing with the claim." (*Crisci* v. *Security Ins. Co.*, *supra*, 66 Cal.2d 425 at p. 431; accord *Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau*, *supra*, 15 Cal.3d 9 at p. 17.) We must agree with plaintiffs that error occurred when the trial court refused their request to instruct the jury concerning the existence of this inference.

Use of an identical instruction has been expressly approved by this court. (*Cain* v. *State Farm Mut. Auto. Ins. Co.*, *supra*, 47 Cal.App.3d 783 at pp. 796-797.) ■ Defendant, however, argues that our prior decision was limited to holding that use of the instruction did not constitute error, but we somehow stopped short of endorsing either its validity or its general applicability. This argument is sheer sophistry. We would not have rejected the claim of error unless we necessarily decided that the instruction was warranted.

■ Nevertheless, plaintiffs exaggerate its impact in asserting that by refusing the instruction the trial court prevented the jury from drawing the inference. (See *Keena* v. *Scales* (1964) 61 Cal.2d 779, 783 [394 P.2d 809].) The nature of that impact is to be assessed in light of "all the circumstances of the case" (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 59 [118 Cal.Rptr. 184 529 P.2d 608, 65 A.L.R.3d 878]), including "the effect of other instructions in remedying the error". (*LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946].)

The trial court instructed the jury with BAJI No. 12.98 that it could consider the good faith defendant's rejection of Petersilge's settlement offers

in light of (among other factors) "the strength or weakness of the third party's claim on the issues of liability and damages." This instruction would naturally focus the jury's attention on the uncontradicted evidence of the size of Petersilge's eventual victory. In light of that ultimate bottom line, the jury could not help but conclude that her claim was far from worthless, and that defendant miscalculated badly in losing the opportunity to settle that claim for less than half the amount it finally cost, a position defendant virtually conceded. (See pt. II(A), *ante.*) Knowing these elemental facts, the jury would conclude as a matter of the simplest logic that accepting Petersilge's offers to settle her claim within defendant's policy limits was, to use the language of the refused instruction, "the most reasonable method of dealing with the claim." Given the benefit of hindsight, no jury could fail to follow this line of reasoning. In short, the import of the missing instruction was so blindingly obvious that its absence comes close to being superfluous. Moreover, the absence of the instruction did not preclude plaintiffs from asking the jury to draw the common-sense inference mentioned in the instruction. Finally, the error involves only an inference that the jury would have been told was "not conclusive." There being minimal potential for the jury being confused or misled in these circumstances, the error does not command reversal. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; *People* v. *Watson* (1956) 46 Cal.2d 818, 835-836 [299 P.2d 243]; *Canavin* v. *Pacific Southwest Airlines* (1983) 148 Cal.App.3d 512, 523-524 [196 Cal.Rptr. 82].)

### (D)

Our Supreme Court has stated that "a belief that the policy does not provide coverage, should not affect a decision as to whether the settlement offer in question is a reasonable one" (*Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau, supra,* 15 Cal.3d 9 at p. 16), and that "[a] good faith belief in noncoverage is not relevant to a determination of the reasonableness of a settlement offer." (*Samson* v. *Transamerica Ins. Co., supra,* 30 Cal.3d 220 at p. 243.) Plaintiffs requested instructions embodying these quotes, but the trial court refused to instruct the jury with them. Plaintiffs view this as error because it prevented them from arguing a theory supported by evidence—namely, that a major motivation for defendant refusing to settle was its belief that its products liability policy did not cover the Petersilge claim of negligence.

One may wonder, in the abstract, how a products liability policy issued by defendant to Armstrong came to defend a negligence claim against Sears. Nevertheless, defendant did read its policy as extending this very protection. Granted, defendant initially did so subject to a reservation of rights, but this caveat was subsequently retracted less than a week later. It is true that

several individuals—most of whom worked in defendant's San Francisco branch office—continued thereafter to entertain doubts as to the correctness of this decision. But the evidence was uncontradicted that coverage issues were the exclusive responsibility of defendant's Boston home office, as was the ultimate authority for deciding whether to accept or reject a settlement offer in a case of the magnitude of Petersilge's claim. Conversely, there was no evidence that any of the individuals who still doubted coverage raised this issue at the time or the level where authoritative settlement decisions were made. Indeed, the evidence was uncontradicted that those who questioned coverage consciously excluded it as a factor when, at a much lower level of the decisionmaking hierarchy, they evaluated and made recommendations concerning Petersilge's settlement offers. In light of these circumstances, and within the context of the posture of the case as it went to the jury, the matter of coverage was not an issue. It follows that plaintiffs' proposed instructions related to an irrelevant abstraction whose potential for confusing the jury justified their rejection. (See *LeMons* v. *Regents of University of California, supra,* 21 Cal.3d 869 at p. 875; *Travelers Ins. Co.* v. *Lesher* (1986) 187 Cal.App.3d 169, 187 [231 Cal.Rptr. 791]; *Harris* v. *Chisamore* (1970) 5 Cal.App.3d 494, 500 [85 Cal.Rptr. 223].)

The purported appeals from the orders denying motions for summary judgment and for a new trial are dismissed. The judgment and the order denying the motion for judgment notwithstanding the judgment are affirmed. Defendant shall recover its costs of appeal.

Anderson, P. J., and Reardon, J., concurred.